Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION

No. 04-09-00777-CV

**IN THE ESTATE OF WILBUR WALDO LYNCH**, Deceased

From the County Court at Law, Kendall County, Texas
Trial Court No. 05-090-PR
Honorable Bill R. Palmer, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Sandee Bryan Marion, Justice
Rebecca Simmons, Justice
Marialyn Barnard, Justice

Delivered and Filed:  April 20, 2011

AFFIRMED

This appeal arises from a will contest over the 2003 will of Wilbur Waldo Lynch.  Wilbur

had three daughters: Peggy Sackheim, Patricia Alderman, and Tracy Lynch.  Wilbur died in July

2005, and Tracy filed an application to probate the 2003 will.  After it was admitted to probate,

Peggy and Patricia contested the will on the grounds that their father lacked testamentary

capacity to execute the 2003 will and he executed it as a result of undue influence by Tracy.  A

jury returned a verdict in favor of Peggy and Patricia and awarded them their attorney's fees.

Although the jury found that Tracy incurred over $600,000 in reasonable and necessary

attorney's fees, it found she did not act in good faith and with just cause in defending the 2003

will.  Based on the jury's verdict, the trial court set aside the order probating the 2003 will,

admitted the 2001 will to probate, granted Peggy and Patricia their attorney's fees, and denied Tracy's request for attorney's fees. Tracy now appeals.

## BACKGROUND

Wilbur had a career that included flying planes during World War II, working for Pan American World Airways, and running a small oil and gas business. He and his wife's two eldest daughters, Peggy and Patricia, were sixteen and fourteen years, respectively, older than their youngest daughter, Tracy. In 1995, Wilbur suffered a stroke. Patricia, who lives in Florida, began to travel to Wilbur's home in Boerne, Texas once a month for six and one-half years to assist Wilbur with his business. Peggy lives in Arizona, and Tracy lives in Texas.

In March 2000, Wilbur's wife died. After her mother's death, Tracy and her children moved in with Wilbur to care for him. By this time, Wilbur needed help with everything, including bathing and eating. He could not read, and he needed help using the telephone or the television.

In November 2000, Wilbur filed an "affidavit" at the courthouse giving Tracy his house. In April 2001, the entire family met with an estate planning attorney, John Bakke, and Wilbur created an inter vivos trust that required the unanimous consent of his three daughters to dispose of his property. Additionally, Wilbur executed the 2001 will that left his estate in equal shares to his three daughters upon his death. He also filed a deed giving Tracy the house.

In May 2001, a caregiver was hired to come to Wilbur's house on weekdays. Sherri Zaskoda, an experienced geriatric nurse's aide, took Wilbur to his doctor's appointments, filled his prescriptions, prepared some meals, and ensured Wilbur and his home were clean. Zaskoda was with Wilbur forty hours per week for more than two years. According to Zaskoda, Wilbur

had good days and bad days, and none of his doctors discussed the possibility that he suffered from dementia.

In 2003, William Leighner, the attorney who prepared the 2003 will, hired Dr. Raymond Costello, a clinical psychologist, to conduct a testamentary capacity evaluation of Wilbur. At the conclusion of the evaluation, Dr. Costello "saw no reason to question [Wilbur's] competency to execute his Last Will and Testament at this time or for the foreseeable future within the next few months if no untoward medical situations occur." Four days later, Wilbur executed the 2003 will. Wilbur died in 2005 at the age of ninety-two.

## DOES A FINDING THAT A TESTATOR LACKS TESTAMENTARY CAPACITY CONFLICT WITH A FINDING THAT HE WAS UNDULY INFLUENCED

In answer to jury question number one, the jury found that Wilbur did not have testamentary capacity when he executed the 2003 will.[1] In answer to jury question number two, the jury found that at the time Wilbur executed the 2003 will, he was acting under the undue influence of Tracy.[2] In her first issue, Tracy asserts these findings create an irreconcilable conflict because a person cannot both lack testamentary capacity and be unduly influenced. She argues these findings implicate the same material fact: a person's mental capacity. In a related issue, Tracy asserts the trial court erred by admitting into evidence the testimony of appellees' expert, Dr. Martha Leatherman, a geriatric psychiatrist, because Dr. Leatherman failed to

---

[1] The jury was instructed that "testamentary capacity" means "sound mind. It is the required legal capacity to make a Will and means that a person, when signing a Will, must have the sufficient mental ability to:
    1. Understand the business in which he is engaged;
    2. Understand the effect of his act in making a Will;
    3. Know his next of kin and the objects of his bounty and their claims upon him;
    4. Understand the general nature and extent of his property; and
    5. Have sufficient memory to collect in his mind the elements of the business to be transacted, to hold them long enough to perceive, at least their obvious relation to each other, and to be able to form a reasonable judgment as to them."

[2] The jury was instructed that "undue influence" means: "(1) the existence of an influence; (2) that subverts or overpowers the mind of the testator at the time of the execution of the will; and (3) the will would not have been signed by the testator but for such influence."

recognize that lack of testamentary capacity and undue influence are mutually exclusive.[3] Tracy asserts Dr. Leatherman's opinion that a person can lack testamentary capacity and be unduly influenced has been rejected by both the Texas Supreme Court and this court. Therefore, according to Tracy, because Dr. Leatherman's opinion "is contrary to established, black-letter law," it is entitled to no weight and her testimony amounts to "no evidence."

Lack of testamentary capacity and undue influence are two distinct grounds for avoiding a will. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034, 1036 (1939). Many courts, including this one, have relied without further analysis on *Rothermel* for the proposition that a finding of testamentary incapacity and undue influence are in conflict. *See, e.g.*, *Lowery v. Saunders*, 666 S.W.2d 226, 229 n.2 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (stating in a footnote "that the testatrix lacked testamentary capacity and that she was unduly influenced are in conflict"). In *Rothermel*, the Texas Supreme Court stated that "while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power."[4] 369 S.W.2d at 922. The *Rothermel* Court relied on its opinion

---

[3] Tracy also contends Dr. Leatherman's opinion is unreliable because her methodology was flawed. Tracy did not argue this complaint during the *Daubert* challenge hearing; therefore, it is waived. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (holding "when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis").

[4] The *Rothermel* Court stated as follows:

> Undue influence in the procurement of a testament is a ground for its avoidance separate and distinct from the ground of testamentary incapacity; for while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power. Thus, before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence.

369 S.W.2d at 922 (internal citations omitted).

in *Long*, which stated that "[u]ndue influence in its essential elements has no real relation to mental incapacity." 125 S.W.2d at 1036. "Mental incapacity implies the lack of intelligent mental power; while undue influence implies within itself the existence of a mind of sufficient mental capacity to make a will, if not hindered by the dominant or overriding influence of another in such a way as to make the instrument speak the will of the person exercising undue influence, and not that of the testator." *Id.*

We acknowledge that the Supreme Court has recognized that a finding of undue influence *implies* the existence of a sound mind. However, neither the Texas Supreme Court nor this court has held that a finding of undue influence *requires* the existence of sound mind. In fact, the *Long* Court recognized that "weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in determining whether or not a person was in a condition to be susceptible to undue influence." *Id.* Even in *Lowery*, a panel of this court recognized that "evidence of impaired mentality not amounting to testamentary incapacity may afford an opportunity for the exercise of undue influence . . . ." 666 S.W.2d at 233. In that case, this court upheld the trial court's finding that the testatrix lacked testamentary capacity, but stated "[i]f, however, we are wrong about testatrix's lack of testamentary capacity, we are, nevertheless, convinced that there is evidence showing that an impaired mental condition existed which made likely through influence of another the destruction of testatrix's free agency and free will and the substitution of the other's will so as to cause the testatrix to do what she otherwise would not have done but for such other's influence." *Id.* The *Lowery* court concluded that "a finding of undue influence is appropriate where it is shown that the testatrix is laboring under an impaired mental condition not amounting to actual testamentary incapacity at the time of the will's execution." *Id.* at 235.

From these cases, we conclude that testamentary incapacity and undue influence are not necessarily mutually exclusive; in fact, one (incapacity) may be a factor in the existence of the other (undue influence). Accordingly, we are unwilling to hold that in all cases a person cannot both lack testamentary capacity and be unduly influenced. Thus, we conclude an expert, such as Dr. Leatherman, is not precluded from opining on both questions.

Furthermore, we conclude the jury's affirmative findings on those questions are not in irreconcilable conflict. "The test for determining whether an irreconcilable conflict between issues exists is whether one finding alone requires judgment in the plaintiff's favor and the other finding taken alone requires judgment in the defendant's favor." *Alamo Cmty. Coll. Dist. v. Browning Constr. Co.*, 131 S.W.3d 146, 166 (Tex. App.—San Antonio 2004, pet. denied); *see also Gainsco County Mut. Ins. v. Martinez*, 27 S.W.3d 97, 102 (Tex. App.—San Antonio 2000, pet. dism'd) (conflicting findings require reversal only if one of the conflicting findings necessarily requires a judgment different from the trial court's judgment). "Or, as one court phrased it: 'To determine whether there is reversible error, the appellate court must only decide whether the conflict is such that one answer would establish a cause of action or defense, while the other would destroy it.'" *Alamo Cmty*, 131 S.W.3d at 166 (citation omitted).

In this case, an affirmative answer on either one of the two questions requires a finding in favor of appellees, while a negative answer on only one does not destroy the appellees' case. Therefore, the findings do not irreconcilably conflict. Accordingly, we overrule Tracy's first and second issues.

## SUFFICIENCY OF THE EVIDENCE

In her third issue, Tracy asserts the evidence is legally and factually insufficient to support the jury's findings on testamentary capacity and undue influence. Because we overrule

Tracy's second issue regarding Dr. Leatherman's opinion, the following review of the record includes her testimony.

When, as here, a contest is filed after a will has been admitted to probate, the burden of proof is on the contestant to show by a preponderance of the evidence that the will is invalid. *Lee v. Lee*, 424 S.W.2d 609, 610 n.1 (Tex. 1968). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* If the evidence falls within the zone of reasonable disagreement, then we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The fact-finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).

Testamentary capacity means that a party must have sufficient mental ability to: (1) understand the business in which he is engaged; (2) understand the effect of the act in making a will; (3) understand the general nature and extent of his property; (4) know his next of kin and the natural objects of his bounty and the claims upon him; and (5) collect in his mind the elements of the business to be transacted and hold them long enough to perceive their obvious relation to each other and to form a reasonable judgment about them. *See Prather v. McClelland*, 76 Tex. 574, 13 S.W. 543, 546 (1890); *Tieken v. Midwestern State Univ.*, 912

S.W.2d 878, 882 (Tex. App.—Fort Worth 1995, no writ). Evidence of incapacity at other times may be used to establish incapacity on the day the will was executed if it "demonstrates that [the] condition persists and 'has some probability of being the same condition which obtained at the time of the will[']s making.'" *Lee*, 424 S.W.2d at 611; *see also Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983). Thus, the evidence adduced by the appellees in this case must pass two tests. First, was the evidence of the kind that would indicate lack of testamentary capacity? Second, if so, was that evidence probative of Wilbur's capacity, or lack thereof, on April 8, 2003, when the contested will was executed?

On appeal, Tracy argues that Wilbur understood the purpose and effect of signing the 2003 will, which was to pass his assets to his heirs upon his death, and he specifically stated the reason he was executing the 2003 will was because "one of [his] daughters has challenged it . . . [s]he wants money and I don't have any money . . . I've given her a bundle of it, but she wants more." In support of her argument that the evidence is legally and factually insufficient to support a finding that Wilbur lacked testamentary capacity, Tracy relies, in part, on the testamentary capacity examination conducted by Dr. Raymond Costello, a clinical psychologist, four days before the 2003 will was executed. Dr. Costello did not review any medical records; instead, he spoke with Wilbur and conducted tests, all while at Wilbur's home and in the presence of Tracy and her son. Dr. Costello explained his practice was to have a family member present in case health issues arose. Dr. Costello described Wilbur as neat, clean, affable, and articulate. On one of the tests, Wilbur scored: (1) 37 for attention, which is six points above the minimum for possible problems in people ages sixty-five to eighty-one; (2) 14 on verbal fluency, which is one below the minimum; and (3) 37 on a conceptualization test, which is six points above average. According to Dr. Costello, Wilbur did very well on two memory tests. Dr.

Costello concluded Wilbur comprehended the nature and reasons for the evaluation and fully appreciated the information supplied in the informed consent. However, he also conceded that the test Wilbur failed indicated his stroke had affected the frontal lobe of his brain, which controls a person's ability to make decisions, process information, sequence information, and understand new concepts. Dr. Costello said he knew nothing about the specifics of the 2003 will, including that Tracy would be the primary beneficiary. Dr. Costello agreed Tracy had influence over Wilbur, but it was not for him to say to what degree.

The appellees rely on the testimony of Dr. Leatherman, a geriatric psychiatrist who diagnoses and treats elderly patients with issues of dementia, memory loss, Alzheimer's, and depression associated with aging. The average age of her patients is eighty to eighty-two years old. Dr. Leatherman never met Wilbur; instead, for the purpose of testifying on behalf of the appellees, she reviewed all of his medical records and the depositions of his three daughters, his sister, a caregiver, Dr. Costello, the lawyer who prepared the 2003 will, and Dr. Arambula, the forensic psychiatrist retained by Tracy. She also spoke to Wilbur's treating physician. According to Dr. Leatherman, Wilbur's medical records document his stroke, problems in his brain pathology and his ability to think, as well as that he suffered from dementia and memory loss. She also reviewed depositions describing how he behaved and acted. Dr. Leatherman explained because there are no lab tests or blood tests that detect dementia, psychiatrists must rely on abnormalities in a person's behavior. Therefore, the diagnostic "gold standard" in psychiatry is the clinical examination. However, she also stated that a retrospective analysis of records is a generally accepted method when testifying about testamentary capacity and undue influence because the person is generally already deceased and cannot be examined.

According to Dr. Leatherman, people with dementia often have good days and bad days. In her opinion Wilbur suffered from cerebrovascular disease on April 8, 2003. She said he was diagnosed with dementia both prior to and after April 8, 2003. "And it doesn't go away. It doesn't get better." Dr. Leatherman explained that the dementia caused by the cerebrovascular disease affects testamentary capacity. Although no medical record specifically stated Wilbur suffered from dementia on April 8, 2003, his medical records document that he suffered from dementia prior to and after 2003. Based upon these records, Dr. Leatherman concluded he suffered from dementia on April 8, 2003 because he had already had irreversible strokes that led to a diagnosis by his neurologist that he had dementia. He also evidenced progressive vascular disease and his level of functioning continued to decline from before the will was executed until after it was executed. She said he had memory loss and "thinking problems" as early as 2001, and he went into special treatment to try to improve his memory in 2001. Because the disease does not come and go, Dr. Leatherman opined that if Wilbur had progressive brain disease before the will's execution, he had it on the date the will was executed. When asked about the type of dementia Wilbur suffered, Dr. Leatherman explained that the death certificate showed the cause of death as senile dementia, which is an "umbrella term that means dementia associated with aging."

Dr. Leatherman also stated that the area of the brain in which Wilbur suffered his stroke is an area in which "executive function" is common and that dementia almost always affects executive function. Dr. Leatherman described executive function as that part of the brain "that does everything," including taking information from other parts of the brain and acting on the information, making "the decisions for the rest of the brain," and helping "the brain plan and sequence and prioritize." She testified that executive function is related to testamentary capacity

because it relates to holding multiple pieces of information in one's mind, having insight and judgment, and then manipulating all the information and data. She believed Wilbur had impaired executive function on April 8, 2003 based on the diagnosis of dementia before and after the will's execution, as well as the medical records showing the location of the strokes as affecting the executive function area of the brain. She believed the impaired executive function was caused by his cerebrovascular disease and dementia, as well as the strokes.

Dr. Leatherman was critical of Dr. Costello's examination of Wilbur because it was conducted in the presence of Tracy and one of Tracy's children. According to Dr. Leatherman, the presence of another person in the room, especially one with a stake in the outcome of the examination, might invalidate the results because of subtle cues (e.g., disapproval). She also pointed to inconsistent answers Wilbur gave to some of Dr. Costello's questions. For example, when asked by Dr. Costello why he was preparing his will, Wilbur answered, "Because one of my daughters has challenged it. She wants money and I don't have any money. I've given it all away. I've given her a bundle of it, but she wants more." Dr. Leatherman believed there were several internal inconsistencies in this statement: if he has no money, why is he making a will; and, at this time, no one had contested the will because it had not yet been executed.[5] She also noted that Wilbur was a financially sophisticated man throughout his life, having been successful in at least two very different industries, but he provided only a rudimentary list of his assets: "stocks, retirement bonds, Wilson County oil patch-8 wheels, and 2 cars."[6] Dr. Leatherman said this was consistent with frontal brain lobe problems and dementia. In answer to Dr. Costello's question of whether "testator's description of estate seems realistic and/or match [sic] description

---

[5] Dr. Costello agreed there were inconsistencies between the answers Wilbur gave him and the will.

[6] Tracy contends Wilbur recognized the general nature and extent of his property and he did not provide more detail in answer to Dr. Costello's question because Dr. Costello did not ask for more detail.

from collateral source," the only collateral source listed was Tracy, who, according to Dr. Leatherman, "was sitting in on the evaluation" and "had a vested interest in making him look good for the evaluation." She believed the collateral source should have been a non-interested source, such as bank statements and other family members.

Dr. Leatherman also noted that when identifying his family, Wilbur omitted one of his grandchildren by Peggy and two of his great-grandchildren by Patricia who were frequent visitors.[7] When asked to describe the role of each family member in his life, Wilbur responded, "Peggy is a stranger. She just stands by and wants money." Dr. Leatherman was critical of the lack of follow-up questions by Dr. Costello because, according to her, delusions or misperceptions are common with dementia and the lack of follow-up did not test whether Wilbur's statement was due to a misperception.

Wilbur also mentioned his sister, Carolyn Watts, as "my little sister, and I love her." But Carolyn was not mentioned in the will, and was not mentioned as a potential guardian or as someone responsible for his remains. On the other hand, despite never mentioning to Dr. Costello the name Lovika DeKoninck, who is a long-time friend of Tracy's, Wilbur designated DeKoninck in the 2003 will to serve as trustee of his estate if any beneficiary is under the age of thirty. In another document, Wilbur names DeKoninck as the first alternate guardian (after Tracy) of his person and estate in the event a guardianship becomes necessary. Wilbur answered "not applicable" when asked by Dr. Costello how he intended to include friends, acquaintances, and organizations. However, in his will, he left one half of his estate to an Austin, Texas German shepherd dog rescue and the other half to a Houston, Texas German shepherd dog rescue if Tracy and her children predeceased him.

---

[7] Tracy argues Wilbur did not list all of his grandchildren because Dr. Costello did not ask Wilbur to do so.

Dr. Leatherman thought this was significant because it indicated Wilbur either did not remember on the date of Dr. Costello's evaluation that he wanted to include a distant acquaintance (DeKoninck) and German shepherd rescue organizations in his will or he did not know when he made the will what he had said four days earlier. Dr. Leatherman said this amounted to poor memory, poor ability to hold a lot of information in his mind, and poor ability to make rational decisions and communicate those decisions. When asked if he knew how he wanted to dispose of his property, Wilbur said the house was already deeded to Tracy and the remaining assets were to be placed in trust with Tracy as the trustee. However, four days later when he executed the will, the will states in bold capital letters that his remaining assets would be distributed to Tracy "Outright and free from trust."

Dr. Leatherman said the 2003 will was not consistent with Wilbur's responses during the testamentary capacity evaluation for the following reasons: (1) he told Dr. Costello he had no other significant relationships or organizations, but under the will he gave the remainder of his estate to two German shepherd dog rescue organizations if the named beneficiaries predeceased him; and (2) he told Dr. Costello he wanted his assets held in trust, but under the will he directed that all remaining assets and accumulated income of the Wilbur Waldo Lynch Trust be distributed outright and free from trust to Tracy. She thought it significant that William Leighner, the attorney who drafted the 2003 will, was the person who found the German shepherd rescue organizations, not Wilbur.[8] Leighner stated in a memo that Wilbur wanted to favor Tracy who after his wife's death "came immediately to take care of him and has lived with him ever since." However, Dr. Leatherman said that what was omitted is the fact that Patricia

---

[8] Leighner described Wilbur's "wonderful" conversational abilities, and he said Wilbur talked about his dogs and about how his father came from Limerick, Ireland. However, Wilbur's father was born in Alabama. According to Dr. Leatherman this type of fabrication was secondary to his dementia.

came once a month for one week to help with his finances. Therefore, according to Dr. Leatherman, Wilbur did not know what he was signing when he executed the 2003 will because it was a complicated will, containing a lot of information. She believed Wilbur was incapacitated on April 8, 2003 to the extent that he was incapable of understanding the nature and extent of his property or the complex financial structure around which he had built his assets. She also believed Wilbur was incapacitated on April 8, 2003 to the extent that he was incapable of recognizing his heirs or knowing their relationship to him and to each other. Finally, she believed he was unaware of some of the objects of his bounty.

Based on a review of all the evidence, we conclude the evidence is legally and factually sufficient to support the jury's finding that Wilbur lacked testamentary capacity when he executed the 2003 will. Therefore, we do not address the sufficiency of the evidence in support of the undue influence finding.

### ATTORNEY'S FEES

When any person designated as executor or as a beneficiary in a will or an alleged will "defends [the will] or prosecutes any proceeding in good faith, and with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings." TEX. PROB. CODE ANN. § 243 (West 2003).

The jury found that Tracy incurred over $600,000 in "reasonable and necessary" attorney's fees. However, because the jury also found that Tracy did not act "in good faith and with just cause in defending the April 8, 2003 will," the trial court denied payment of her fees out of the estate. On appeal, Tracy asserts the evidence supporting the jury's finding that she did not act with good faith and just cause is legally and factually insufficient.

The jury was instructed that "good faith" means "an action which is prompted by honesty of intention or a reasonable belief that the action was probably correct." The jury was further instructed that "with just cause" means "that the action of the person was based on reasonable grounds and there was a fair and honest cause or reason for the actions. The term . . . includes probable cause." Based upon the evidence recited above on the issue of testamentary capacity, we conclude the evidence supporting the jury's implied findings that Tracy's actions were not prompted by honesty of intention or with a reasonable belief that her action was probably correct and that Tracy's actions were not based on reasonable grounds and there was no fair and honest cause or reason for her actions are supported by sufficient evidence.

Tracy also asserts the finding that she did not act in good faith or with just cause conflicts with the jury's finding that her attorney's fees were reasonable and necessary. This complaint is waived because Tracy did not raise it before the jury was discharged. *See Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 244 (Tex. App.—San Antonio 1996, writ denied) (holding that complaint that jury findings irreconcilably conflict is waived if it is not made before jury is discharged); *see also* TEX. R. CIV. P. 295.

## CONCLUSION

We overrule Tracy's issues on appeal and affirm the trial court's judgment.


Sandee Bryan Marion, Justice