

In The

# Court of Appeals
## Seventh District of Texas at Amarillo

_____

No. 07-11-00348-CV
_____

ANNIE COLE TRUITT, APPELLANT

V.

SUSAN COLE BYARS AND WILLIAM C. COLE, APPELLEES

On Appeal from the 46TH District Court
Wilbarger County, Texas
Trial Court No. 25,629, Honorable Dan Mike Bird, Presiding

May 30, 2013

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellant, Annie Cole Truitt, appeals from the trial court's judgment admitting the *Last Will and Testament* of Mary Faye Cole ("Cole") dated November 20, 2009 ("2009 will") to probate. Appellees, Susan Faye Cole Byars and William C. Cole were the applicants for probate of the 2009 will. Truitt asserts the trial court erred by admitting the 2009 will to probate rather than Cole's *Last Will and Testament* dated September 20, 2010 ("2010 will") because the evidence was (1) legally and (2) factually insufficient

to establish Cole lacked testamentary capacity to execute the 2010 will; and (3) legally and (4) factually insufficient to establish Cole was unduly influenced to execute the 2010 will. We affirm.

## BACKGROUND

This is a will contest wherein allegations of lack of testamentary capacity and undue influence typically stand or fall depending on the sufficiency of the facts underlying the trial court's judgment. *See Rothermel v. Duncan,* 369 S.W.2d 917, 921 (Tex. 1963). In that regard, no two cases are alike. *Id.* Given the polarity in the parties' factual contentions, it is necessary to undertake a detailed summation of the evidence presented during the two day bench trial.[1]

Cole was seventy-eight years old when she passed on October 13, 2010. She was survived by five children (Susan Faye Cole Byars, William C. Cole, Annie Lee Cole Truitt, Roy Cole and Thomas Ed Cole), eight grandchildren, and four great-grandchildren.

### GUARDIANSHIP PROCEEDINGS

In September 2009, Truitt filed an application for permanent guardianship of Cole and her estate. In her application, Truitt attested Cole was suffering from Alzheimer's disease and was unable to manage her property or financial affairs without a legal guardian. The application proposed that Truitt be appointed Cole's permanent legal

---

[1]In addition to the trial testimony of Susan Faye Byars, Kristi Hyatt, Jay Cantrell, Truitt, Dr. Francis Anwasi, Ruth Timberlake, Diana Negrete, Crystal Negrete, Marshall Capps, and Stephanie Hord, the parties stipulated to admission of the deposition transcripts of Terry Donk and Mary King as well as certain investigative records from Adult Protective Services, a subdivision of the Texas Department of Family and Protective Services.

guardian with the power to deal with her mother's finances to the same extent as her mother could if she were able. Truitt's application sought permanent guardianship because Cole "lack[ed] the capacity to manage her business and financial affairs." In that proceeding, the trial court appointed an attorney, Marshall Capps, to represent Cole as her attorney *ad litem*.

Capps visited Cole three to four times after his appointment as attorney *ad litem*. According to his testimony, Cole had expressed a desire to get to a point where she could live free from family strife. In addition to the pending guardianship action, Cole's children were previously involved in litigation concerning a family trust established by Cole's late husband, William Horace (Buster) Cole.[2] Ultimately, the proceeding did not result in the appointment of a permanent guardian.

### 2009 WILL

In the fall of 2009, Susan Byars contacted Kristi Hyatt, an attorney who had known Cole for "about" four years,[3] to set up an appointment for the purpose of drafting a will. Other than arranging that appointment, Cole's family did not participate in the drafting process or otherwise give Hyatt any instructions. Following a private meeting with Cole, Hyatt prepared the will and sent it to her for approval. On November 20, 2009, Cole executed that will at Hyatt's office. Hyatt testified that she had no concerns about Cole's competence or soundness of mind at the time she executed the 2009 will.

---

[2]In the litigation involving the family trust, Truitt sought to remove the trustees, Susan and William, and recover her attorney's fees. According to Truitt, this litigation was originally filed by her brothers, Roy and Thomas Ed, concerning a dispute over some property belonging to the trust.

[3]Hyatt testified that she had earlier assisted attorneys representing the trustees in litigation where Cole had been named as a defendant.

3

The 2009 will appointed Susan Faye Byars and William C. Cole as independent co-executors and co-trustees of all trusts created by the will. The will provided that all principal and income from the family trust established by her late husband would pass to Susan and William in equal amounts. If either Susan or William predeceased her, the trust distribution would be made to Cole's grandchildren, subject to the establishment of contingent trusts for those grandchildren who were less than twenty-one years of age or incapacitated. After providing for her debts, the residue of her estate passed to Susan and William in equal amounts, subject to similar contingent trust provisions.

### NEW POWER OF ATTORNEY

In June 2010, Cole was living at Wynwood Assited Living in Vernon, Texas. Stephanie Hord, LVN and Health/Woman's Director at Wynwood, provided oversight for Cole's medication program. In that capacity, she saw Cole on a daily basis. Cole was on medications for anxiety, upset stomach, heartburn, Parkinson's disease, pain, and dementia. Although Cole was generally oriented as to person, there were times when she was not oriented as to place or time. On certain days, Cole was difficult to understand. On other days, she was unable to take her medication due to swallowing problems. She had a history of congestive heart failure, high blood pressure, and plaque build-up in her veins.

Truitt moved from Galveston to Vernon in June of 2009 to be with her mother. Prior to her arrival, she had not visited Cole for approximately one year. Truitt testified she came to visit her mother because Cole had been hospitalized for dehydration and depression. The second day after her arrival Truitt had a conversation with Cole about

4

why she had sued her mother concerning the family trust.[4] Truitt explained that she didn't initiate the litigation but was drawn into it and, as a result, she had accrued considerable legal fees. She told her mother that, during mediation, the trustees (Susan and William) and her twin brothers (Roy and Thomas Ed) agreed to pay each other's legal fees, or a portion thereof, but they would not agree to pay hers.

Truitt testified Cole was experiencing hallucinations in the evenings, typically lasting until after dark. She indicated her mother had "some mild dementia" and occasional memory problems although she did not believe her mother had Alzheimer's disease. Truitt also took her mother to see an alternative medicine doctor who made changes to Cole's heart medications. Dr. Lindsey Streit, Cole's primary physician, did not approve of the medication changes.

On June 25, Hord discussed the changes sought by the alternative medicine doctor with Truitt. Hord's concern was that the new doctor had prescribed several changes to Cole's heart medications and fluid pills that were not in her best interest. Hord testified "that's generally not just something that we completely go in and stop on someone that has a history of cardiac problems." Hord also indicated to Truitt that, before the changes could be implemented, she was required to obtain approval from Susan, who had Cole's power of attorney.

In July, Truitt hired Jay Cantrell, an attorney she found on the internet, to prepare a new power of attorney for Cole. Truitt called Cantrell "at her mother's request," and instructed him to prepare a new power of attorney empowering Truitt to "do and perform

---

[4]At the time, Truitt's guardianship proceeding was pending.

5

each and every act and thing that I may or can do (either personally or through my person), . . . so long as [Truitt] shall deem, in his (sic) discretion, the act to be proper, expedient or advisable." There was no evidence Cole ever spoke with Cantrell or had any participation in drafting the new power of attorney. On July 10, Cole purportedly executed the document drafted by Cantrell.

After Truitt was given power of attorney authority, Cole's medical condition substantially declined. Although Cole had been very active and walked throughout Wynwood, she now had trouble walking and stayed in her room. Hord also testified Truitt had Cole's pet cat put to sleep, when others at Wynwood believed Cole would never have consented to it. Truitt also had access to Cole's bank account containing approximately $200,000.

### 2010 WILL

#### A. PRE-EXECUTION

In mid-July, Adult Protective Services received a complaint that Truitt had medically neglected Cole by taking her off her blood pressure and heart medications. On July 14, representatives of Adult Protective Services interviewed Cole and Truitt. Cole was unaware Truitt now had access to her bank account and could not explain why she had replaced Susan with Truitt as the person with her power of attorney. Truitt indicated Cole was in very poor health and feared she would not live long. Truitt also indicated Cole was unaware that the 2009 will had cut Truitt completely out of any inheritance.

6

On July 16 and 17, Cole called Hyatt, and/or her legal assistants, requesting that they fax her estate papers to Truitt's attorney, Cantrell. In the background, they could hear a voice coaching and prompting Cole. On July 20, Hyatt's assistant received a similar call from Cole and also heard a female voice coaching Cole. The assistant indicated Cole appeared to be answering questions by repeating what someone was saying to her. Later, that same day, Cole called again requesting that estate documents be faxed to Cantrell. Again, the assistant heard a female voice in the background prompting Cole. On July 21, Hyatt received a call directly from Truitt, who, acting as Cole's power of attorney, requested her mother's estate documents. Hyatt testified he was uncomfortable providing the documents because he believed Cole was being coached. Ultimately, however, he complied with the request.

Truitt testified that, after she received the documents from Hyatt, she showed them to her mother, who then indicated she wanted a new will. Truitt testified that, at first, her mother was leaning towards leaving the bulk of her estate to her. Truitt was uncomfortable with that idea because she didn't want her staying with Cole to be seen as something done for personal gain. She testified that, after she expressed these concerns, Cole changed her position and "wanted to leave everything to her grandchildren and her great-grandchildren." Truitt indicated Cole wanted to eliminate any family-fighting and believed her children had "gotten enough" already. Cole's attorney *ad litem* from the guardianship proceeding testified that, throughout this period, Cole never expressed any desire to him that she wanted to change her 2009 will.

From July to August, Cole began to lose more weight. She was having difficulty expressing herself on occasions and gradually progressed to the point she could not

7

take food or medications because she could not swallow. Hord testified Cole's medical condition declined dramatically in August. That same month, Truitt called Cantrell, to schedule an appointment to talk about writing a new will for Cole. Cantrell testified that at their meeting Cole "seemed" to grasp the natural objects of her bounty and "in general what her estate was." During their meeting, no one disclosed to Cantrell that Truitt had sought permanent guardianship over Cole—a fact he testified would have been significant to him. When Cole mentioned experiencing memory problems, Cantrell advised that she have a medical examination. After speaking with Cantrell, Truitt scheduled an appointment for Cole to see Dr. Francis Anwasi. Ultimately, Cantrell decided not to write Cole's will because of the size of her estate.

In September, Cole was no longer able to walk without assistance and needed a wheelchair. She also continued to have hallucinations. Truitt replaced Cole's primary physician with Dr. Anwasi. In addition, Cole began seeing a new doctor, Dr. Jerry Tennet, for her decline in physical condition.

On September 1, Terry Donk, an attorney who had written a will for Cole in 2001, received a call from Truitt indicating Cole was in a rest home and wanted a new will. Truitt testified that over the next day or two she sat down with her mother and went over the 2009 will in detail. According to Truitt, she wrote down what her mother wanted to change about the 2009 will and then faxed her notes to Donk in the form of a letter signed by her mother. Truitt testified the letter was in her handwriting and signed by her as well because Cole had a "very difficult" time writing."[5] She included a medical

---

[5]The letter contained detailed legal instructions regarding the contents of the new will. The letter also contained a note stating: "I don't know if this is relevant, but I have two sons, three other grandchildren

8

competency statement signed by Dr. Answai.[6] Donk drafted a will and faxed it to Truitt on September 13. Truitt faxed back additional changes in her handwriting. On September 15, Truitt made further corrections and gave Donk instructions for instant faxing so she could receive a clean copy suitable for immediate execution. Truitt's instructions regarding the family trust and the clause leaving Cole's entire residuary estate to Truitt were very detailed and framed in legal language. On September 16, Donk prepared the final draft incorporating Truitt's latest changes and sent the will to Truitt by overnight mail. Donk testified in deposition that he didn't know if Truitt had exerted undue influence over Cole because he had no contact with Cole. Instead, he relied entirely on Dr. Anwasi's statement.

Also, on September 16, Dr. Frank Del Rio examined Cole at the request of Adult Protective Services. He concluded Cole had capacity but that "it [was] very close" based on her ability to answer basic questions regarding her safety, basic care, and how to obtain help in an emergency. He also believed her capacity should be revisited in the future and that the outcome could be different at that time. He believed it was strange that Cole's regular sitters, Diana and Crystal Negrete, did not seem to want to leave during his interview. He also felt like there could be some undue influence being exerted on Cole. Further, after he left Cole's room, Truitt approached him and asked

_____

and one great grandchild, to whom I do not wish to leave any of my money or possessions. They are my Son Thomas Ed Cole, his son Joshuah John Paul Cole and Joshuah's son who's (sic) name I don't know; and my son Roy Franklin Cole and his children Christopher Cole and Christine Cole." Cole's signature was barely legible.

[6]On September 9, Dr. Anwasi signed a statement indicating Cole was mentally competent. He filled out the statement after having spent at least thirty minutes with her in his office on three separate occasions. He testified Cole was able to answer questions about her health and sickness and, despite her medical circumstances related to her mental abilities and memory, was always oriented. He also indicated her memory issues were consistent with early dementia.

9

whether the allegations against her had been "dropped" and if Cole had capacity. Dr. Del Rio responded that he was presently unable to share any information.

On September 17, Capps reported to Adult Protective Services that he was worried Truitt was exerting an undue influence over Cole. When he first started talking with Cole, she wanted to have an independent guardian appointed without any connection to her family. After Truitt arrived, he indicated that things changed. He reported that, when he speaks with Cole, she just "parrots" everything that Truitt states. He also told Adult Protective Services that he was at a standstill because the guardianship case was awaiting the appointment of a new judge. Truitt also contacted Adult Protective Services to inform them that Cole was unhappy with Capps and that she was going to see if the judge in the guardianship proceedings would appoint a new attorney *ad litem*.

## B. EXECUTION OF THE 2010 WILL

Hord testified that by September 20, Cole's mental health had definitely deteriorated. She was difficult to understand, her speech was slurred, her recall was slow, and her affect was flat. She testified that Cole did not have an appetite, was continuing to lose weight and was basically chair/bed fast without assistance. Although Cole was oriented as to person, at times she was not oriented to place or time. Hord also testified Cole would become weaker as the day progressed, experienced periods where she would speak randomly, and was often confused.

Robin Koch, Cole's primary caseworker at Adult Protective Services, visited Cole on the 20th at 2:40 p.m. and described her as very tired and not feeling well. Cole

10

wanted to speak with her but asked if she could return at another time. When Koch revisited Cole at 3:15 p.m., she was unaware Koch had visited earlier even though Koch had earlier introduced herself as being from Adult Protective Services and had visited Cole several times before. Before Koch left, Cole asked her to stay for a minute. Koch heard Cole speaking with a woman and afterwards Cole said "I just want to tell you that [Truitt] has not mistreated me in any way. She has not abused or neglected me or taken any of my money."

At 5:30 p.m., Mary King (a notary), Ruth Timberlake (a Wynwood resident), Cole, Truitt, Crystal,[7] and two witnesses, were present for the signing of the 2010 will. King did not recall Cole ever speaking. She did recall Truitt putting the will in front of Cole and saying, "mother, you know this is what we discussed and Mary is here to notarize your—will and she just said yes." She testified Truitt had to "kind of help her hold the pen up to sign it." She indicated that "[Cole] would kind of doze off and wake up. She seemed fine but she didn't—she kept just falling asleep." "When everybody else was visiting and talking, I'd happen to look over there and she would be asleep but then she would come to, you know, every once in a while." That is, "[s]he would wake up, she'd open her eyes and look around." King indicated that it took approximately an hour to complete the signing process because Cole "kept falling asleep and there towards the end, I do remember it did take her a long time to fill the rest out because she kept falling asleep." She further indicated Truitt stood holding the documents and asked Cole to sign, two to three times. Describing the execution process, she testified "[Truitt] just

---

[7]Crystal was hired by Truitt to sit with Cole on weekdays from 1:00 p.m. until 7:00 p.m. and weekends from 3:00 p.m. to 11:00 p.m.

11

kind of helped her hold the pen up but she did sign"—"[i]t was kind of like [Cole] would try to hold her pen and she couldn't hold it real well, and [Truitt] helped her put it in her hand, and then kind of signed it there a little bit. She assisted her."

Truitt testified that executing the will took "close to an hour"--handwriting for her mother was difficult so she "assist[ed] by holding the pen up." She showed her mother where to sign but did not recall her mother asking for any help. She testified Cole discussed the will with others in her presence and understood who the children were and what her assets were. She also testified Cole recognized the residuary clause leaving Truitt the entirety of her residuary estate.

Crystal testified that, on the day the will was signed, she was standing behind Cole the entire time. She testified Cole was "very cognitive;" "[h]er memory was all there;" no one helped Cole to grip the pen; she never dozed off and never closed her eyes. Crystal estimated the execution took approximately thirty minutes. She testified that, in their conversations prior to its execution, Cole wanted "everything to go to her grandkids and great-grandkids."

Timberlake, a long-time Wynwood resident, testified Cole did not speak about property she owned except to say she had a lot of land and stuff. She also told Timberlake that she wanted a new will because she didn't want William or Susan to inherit saying "they already got enough." Cole's other sitter, Diana,[8] testified Cole was pretty alert but did not talk about her property except to say that she had a big farm.

---

[8]Diana was hired by Truitt to sit with Cole from 7:00 p.m. until 10-11:00 p.m. weekdays and 3:00 p.m. to 11:00 p.m. weekends.

Diana testified Cole told her "she wanted to leave everything to her grandkids and great-grandkids" after the 2010 will was signed.

### C. Post-execution

On September 21, Cole was admitted to hospice. She was not oriented and had begun hallucinating. On September 22, Adult Protective Services visited Cole and asked her about the 2009 will that cut Truitt out of her estate. Cole replied she remembered doing it and wanted to do it because what Truitt was doing at the time was not right. On September 28, while Truitt was out of town, Adult Protective Services spoke with her, informing her that Cole's deteriorating condition necessitated that she be sent to a hospital. Truitt would not agree to admit Cole.

On September 29, Cole's other children were visiting her when they were told by an attendant that Cole needed to go to a hospital. Truitt was again contacted and again she declined to admit her mother. An Emergency Medical Technician subsequently decided to take Cole to the hospital because she was requesting to go. At the hospital, Cole was diagnosed with a urinary tract infection and pneumonia. Cole later told Adult Protective Services that she was glad to be hospitalized and wanted medical treatment. Cole's medical condition improved while she was hospitalized but when she was transferred by ambulance to an assisted living facility in Midland, she passed away en route.

Adult Protective Services subsequently summarized its findings at the conclusion of their investigation. Its investigators found William, Susan, Hord, and Capps credible. They found Cole not credible because she gave conflicting statements and appeared to

be coached. Truitt was also found to be not credible because (1) she had her mother sign the 2010 will when, on the day of execution, Adult Protective Services had observed Cole in a confused state of mind, (2) Cole made calls to Adult Protective Services wherein a female voice was overheard coaching Cole as to what to say, (3) Truitt appeared more concerned about Cole's finances than her health and (4) there was evidence Truitt isolated Cole from contact with her other children. Based on their investigation, it was determined that the preponderance of the evidence indicated William and Susan did not exploit[9] their mother. At the same time, Adult Protective Services was unable to determine whether Truitt did exploit Cole.

### Proceedings Below

On October 18, Susan and William filed an *Application for Probate and for Issuance of Letters Testamentary* seeking to admit the 2009 will to probate. On October 29, Truitt filed her opposition to that application and included her own *Application for Probate and for Issuance of Letters Testamentary* seeking to admit the 2010 will to probate. Following a two-day bench trial, the trial court issued its *Final Judgment* granting probate of the 2009 will and denying admission of the 2010 will because it was procured when Cole lacked testamentary capacity and was executed as a result of undue influence exerted by Truitt. On June 30, the trial court entered an order admitting the 2009 will to probate and appointing Susan and William as co-

---

[9]Adult Protective Service investigators used the following definition of "exploitation":  the illegal or improper act or process of a caretaker, family member, or other individual who has an ongoing relationship with the elderly or disabled person using the resources of an elderly or disabled person for monetary or personal benefit, or gain without the informed consent of the elderly or disabled person.

independent executors.  This appeal followed.  Because we find Truitt's third and fourth issues dispositive, we address them first.

## DISCUSSION

### STANDARD OF REVIEW[10]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact.  *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).  In determining whether there is legally sufficient evidence to support the finding under review, this Court must credit evidence favorable to the verdict if reasonable jurors would have done so, disregard contrary evidence unless reasonable jurors could not have done so, and reverse the jury's determination only if the evidence presented at trial would not enable reasonable and fair-minded people to reach the verdict under review.  *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

In reviewing an appellant's factual sufficiency challenge to an adverse finding on which the other party had the burden of proof, we consider all of the evidence in the record, both in support of and contrary to the finding.  *See Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001).  We will set aside the district court's finding

---

[10]The standard of review in jury trials is the same standard that applies in bench trials.  *See MBM Financial Corp. v. The Woodlands Operating Co., L.P.,* 92 S.W.3d 660, 663 n.3 (Tex. 2009).

15

only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Finally, the trial court acts as fact finder in a bench trial. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.,* 190 S.W.3d 108, 111 (Tex.App.—Houston [1st Dist.] 2005, no pet.). Where there are disputed issues of fact, the trial court judge is the sole judge of the credibility of the witnesses; *Thornton v. Dobbs,* 355 S.W.3d 312, 316 (Tex.App.—Dallas 2011, no pet.), and, as such, determines the weight to be given their testimony, and resolves conflicts and inconsistencies in the testimony. *Petrie v. Widby,* 194 S.W.3d 168, 174 (Tex.App.—Dallas 2006, no pet.); *Southwest Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The trial court may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Granger v. Granger,* 236 S.W.3d 852, 859 (Tex.App.—Tyler 2007, pet. denied).

### UNDUE INFLUENCE

Lack of mental capacity and undue influence are two separate and distinct grounds for avoiding an instrument or contract. *See Long v. Long,* 133 Tex. 96, 125 S.W.2d 1034, 1036 (Tex. 1939). "[I]ncapacity implies the lack of intelligent mental power; while undue influence implies within itself the existence of a mind of sufficient mental capacity to make a will if not hindered by the dominant or overriding influence of another in such a way as to make the instrument speak the will of the person exercising the undue influence and not that of the [testatrix]." *Id. See Rothermel,* 369 S.W.2d at

16

922 ("Undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power.") That said, "weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in determining whether or not a person was in the condition to be susceptible to undue influence." *In re Estate of Lynch,* 350 S.W.3d 130, 135 (Tex.App.—San Antonio 2011, pet. denied) (quoting *Long,* 125 S.W.2d at 1036). *See Lowery v. Saunders,* 666 S.W.2d 226, 233 (Tex.App.—San Antonio 1984, writ ref'd) ("evidence of impaired mentality not amounting to testamentary incapacity may afford an opportunity for the exercise of undue influence . . . .")

To prevail on an undue influence claim, the contestant has the burden to prove (1) the existence and exertion of an influence, (2) that subverted or overpowered the testatrix's mind at the time she executed the instrument, (3) so that the testatrix executed an instrument she would not otherwise have executed but for such influence. *In re Estate of Johnson*, 340 S.W.3d 769, 776 (Tex.App.—San Antonio 2011, pet. dism'd) (citing *Rothermel,* 369 S.W.2d at 922). *See Estate of Davis v. Cook*, 9 S.W.3d 288, 292-93 (Tex.App.—San Antonio 1999, no pet.). There must be some tangible and satisfactory proof of the existence of each of the three elements. *Johnson*, 340 S.W.3d at 776 (citing *Rothermel*, 369 S.W.2d at 922).

Importantly, not every influence exerted by one person on the will of another is undue; *Rothermel*, 369 S.W.2d at 922, and its exertion "cannot be inferred by opportunity alone." *See Cotton v. Cotton,* 169 S.W.3d 824, 827 (Tex.App.—Dallas 2005, pet. denied). An influence is not "undue" unless the free agency of the testatrix is destroyed and a testament is produced that expresses the will of the one exerting the

17

influence rather than the one executing the will. *See Long,* 125 S.W.2d at 1035-36. Thus, a will contestant must not only provide evidence that an undue influence existed, they must also offer evidence of the testatrix's state of mind at the time the will was executed that would tend to show her free agency was overcome by such influence. *See Rothermel,* 369 S.W.2d at 922.

The exertion of undue influence is usually a subtle thing, and by its very nature typically involves an extended course of dealings and circumstances. *Johnson,* 340 S.W.3d at 769. Thus, its elements may be proven by circumstantial or direct evidence. *Rothermel,* 369 S.W.2d at 922. Accordingly, "all of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testatrix and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion." *Rothermel,* 369 S.W.2d at 922.

Factors which have been considered in determining the existence of undue influence include: (1) the nature and type of relationship between the testatrix, the contestants, and the party accused of exerting the undue influence; (2) the opportunities existing for the exertion of the type of influence or deception possessed or employed; (3) the circumstances surrounding the drafting and execution of the testament; (4) the existence of a fraudulent motive; (5) whether there has been an habitual subjection of the testatrix to the control of another; (6) the state of the testatrix's mind at the time of the execution of the testament; (7) the testatrix's mental or physical incapacity to resist

or the susceptibility of the testatrix's mind to the type and extent of the influence exerted; (8) words and acts of the testatrix; (9) weakness of mind and body of the testatrix, whether produced by infirmities of age or by disease or otherwise; and (10) whether the testament executed is unnatural in its terms or disposition of property. *In re Estate of Graham,* 69 S.W.3d 598, 609-10 (Tex.App.—Corpus Christi 2001, no pet.) (citing *Rothermel*, 369 S.W.2d at 922). Additionally, whether the person allegedly exercising undue influence took part in the preparation or execution of the will has been considered as a factor; *Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex.App.—Houston [1st Dist.] 1996, no writ), and "[p]roof of the planning and preparation of the will, . . . is the heart of an undue influence case." *Boyer v. Pool,* 154 Tex. 586, 280 S.W.2d 564, 566 (1955). *See Mackie v. McKenzie*, 900 S.W.2d 445, 449 (Tex.App.—Texarkana 1995, writ denied) (motive, character, and conduct of person benefitting from will is relevant).

We discuss each of the elements of an undue influence action below. Because of the similarity between the elements, some overlap is unavoidable.

A. EXISTENCE AND EXERTION OF AN INFLUENCE

The record indicates that, during the period of Truitt's interaction with Cole, Cole was taking a myriad of medications for a variety of medical issues including anxiety, pain, depression, and dementia. She also had a history of high blood pressure and congestive heart failure. Although Cole was generally oriented as to person, at times she was not oriented as to place or time. Her mental and physical health was markedly declining and she suffered from hallucinations, memory problems, and chronic weight loss.

Despite Cole's declining medical condition, upon her arrival, Truitt immediately sought to change Cole's medical care from traditional to alternative. After learning that the changes prescribed by an alternative medicine doctor had to be approved by Susan, as Cole's power of attorney, Truitt hired an attorney to draft a new power of attorney. The new power of attorney, drafted without any involvement from other family members or her attorney *ad litem*, displaced Susan and appointed Truitt. Neither is there any evidence the attorney who drafted the new power of attorney ever met with, or spoke to, Cole, or was involved in any way other than signing the document. Moreover, in obtaining the new power of attorney, Truitt successfully achieved what she had sought through the guardianship proceeding, i.e., complete control of Cole's medical treatment and financial affairs. Afterwards, Truitt ousted Cole's existing doctors in favor of new doctors who had no prior involvement with her mother's medical care. She also had Cole's pet cat put to sleep when others at Wynwood thought Cole would never have consented to it.

Truitt also hired an attorney to draft a new will with no input from Cole's family or her attorney *ad litem.* The 2010 will's provisions represented a complete departure from the terms of the 2009 will. Only Truitt communicated with the attorney. Cole's attorney *ad litem*, Capp, was unaware a new will was being drafted or that Cole even wished to change her beneficiaries. Cole had been talking to him about the appointment of a guardian independent of any family influence. However, after her arrival, Truitt quickly became Cole's new power of attorney, orchestrating the drafting of a new will completely at odds with the terms of the 2009 will — a will that was less than a year old

and drafted after face-to-face meetings with Cole's attorney, and without any family influence. Capp also observed that Cole seemed to "parrot" whatever Truitt stated.

After examining Cole at Wynwood, Dr. Del Rio believed Cole was minimally competent and that Truitt could be exerting undue influence over her. Although Dr. Anwasi opined Cole was competent, he had been her doctor for only a few weeks, had only visited with her two to three times for a period of approximately thirty minutes, and his interaction focused on her health and sickness. As the ultimate trier of fact, Dr. Anwasi's opinion testimony regarding Cole's competency was not binding on the trial court. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex. 1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). Further, as regards any inconsistencies or conflicts of opinion between witnesses, the trial court could accept or reject any or all of that evidence. *See Thornton,* 355 S.W.3d at 316; *Granger,* 236 S.W.3d at 859.

Having reviewed the entire record, we conclude there is legally and factually sufficient evidence to support a finding that undue influence existed and was exerted.

### B. OVERPOWERING THE TESTATRIX'S MIND

After Truitt's arrival, Cole was isolated from her family and her primary medical providers. During that time, Truitt accomplished a complete turn-about in Cole's power of attorney, her medical care, and her estate plans. Other than Cole's signature on the new power of attorney, there is no evidence that she had any input in initiating the process or drafting the document. Shortly thereafter, Cole indicated to Adult Protective

21

Services that she was not aware Truitt would have power over her bank accounts and was uncertain why she displaced Susan and chose Truitt.

After the new power of attorney was executed, Cole was coached as to what to say to members of the law firm who assisted her in drafting an earlier will in order to obtain her estate documents for Truitt. After Cole's medical condition worsened further still, Truitt hired a new attorney to draft a new will for Cole, thereby dispossessing Susan and William in favor of certain grandchildren, great-grandchildren and Truitt. The 2010 will contained no provisions, as did the 2009 will, for the establishment of contingent trusts for grandchildren less than twenty-one years of age or disabled. And, after execution of the 2010 will, Cole told Adult Protective Services that she had executed the 2009 will intending to dispossess Truitt because she did not believe Truitt was doing right. Further, there is no evidence Cole had any input in the selection of the attorneys hired by Truitt.

Further, Truitt, Crystal, and Diana testified that, when the 2010 will was executed, Cole wanted everything to go to her grandchildren and great-grandchildren. However, the 2010 will did not leave *everything* to Cole's grandchildren and great-grandchildren. Rather, some grandchildren and great-grandchildren were disinherited while Truitt inherited all of Cole's residual estate, a disposition contrary to Cole's statements that her children "had enough already." Importantly, several family members that were disinherited in the 2010 will, Roy and Thomas Ed, had opposed Truitt in the Trust litigation and, according to Truitt, treated her unfairly by not agreeing to pay her attorney's fees. The 2010 will also similarly disinherited grandchildren and great-grandchildren from their line of the family.

22

Throughout this period, Cole indicated to her attorney *ad litem* that, in order to avoid family conflict, she wanted an independent guardian—wishes reflected neither in the new power of attorney nor the 2010 will. Moreover, Cole did not express to Capp that she wanted a new will or to dispossess William and Susan. Having reviewed the record, we find that, given Cole's poor physical and mental health coupled with the terms and events surrounding the execution of the new power of attorney and the 2010 will, there is legally and factually sufficient evidence to support a finding that Truitt overpowered Cole's mind and the 2010 will expressed Truitt's will rather than Cole's desires.

### C. NO EXECUTION "BUT FOR" INFLUENCE

In drafting the 2010 will, only Truitt communicated with the attorney. Donk never had any direct communication or face-to-face meeting with Cole. All drafts and edits were circulated through Truitt. Although Cole's health was failing and she could barely pen a legible signature, Truitt's communications to Donk were very detailed and couched in legal language sufficient for direct insertion into a will. Moreover, the 2010 will was drafted by Truitt in isolation with Cole and there was no corroborating evidence establishing that Cole suggested any of its terms. Moreover, even if the trial court gave weight to the testimony of Truitt, Crystal and Diana that Cole wanted to leave everything to her grandchildren and great-grandchildren because her children had already received enough, her 2010 will does not reflect such an intent.

The 2010 will also represented a complete departure from the 2009 will, with only Truitt inheriting as between her siblings – siblings with whom she had a conflict because

23

of the earlier litigation concerning the family trust. Remarkably, the 2010 will required that any memorandum disposing of Cole's personal effects be in Cole's handwriting when Cole could barely sign her name in a legible manner with Truitt's assistance. In addition, there was no involvement by Cole's other family members or her attorney *ad litem* in the formation or execution of the 2010 will. Afterwards, in a conversation with Adult Protective Services, Cole recalled that the 2009 will dispossessed Truitt because she wanted it that way and remembered Truitt was not acting right.

Finally, the day the 2010 will was executed, Cole had no appetite, was suffering from chronic weight loss, was chair/bed fast, weakened as the day progressed, had memory issues and, in the afternoon, appeared very tired and not feeling well. She was unaware from one hour to the next whether Adult Protective Services had visited her and, while there, she was being coached to make statements vindicating Truitt of exploitation complaints being made against her. When it came time for the will to be executed, Cole did not speak while drifting in and out of awakened consciousness. Truitt put the will in front of Cole, told Cole it was what they discussed, indicated where Cole should sign and helped Cole hold the pen while she signed. All told, the "signing" took approximately an hour.[11]

Having considered the entire record, we cannot say the trial court's finding was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176. Accordingly, we find there was legally and

---

[11]Regarding execution of the 2010 will, the trial court apparently gave little or no weight to the conflicting and, at times, inconsistent testimony of Truitt, Timberlake and Crystal. *See Thornton,* 355 S.W.3d at 316; *Granger,* 236 S.W.3d at 859.

factually sufficient evidence to support the trial court's finding that the 2010 will would not have been executed but for undue influence exerted by Truitt.

Truitt's third and fourth issues are overruled and her remaining issues are pretermitted. *See* Tex. R. App. P. 47.1.

## Conclusion

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice