Karen **GRANGER,** Appellant,

v.

Helen **GRANGER,** Elijah Granger, Chester **Benjamin,** Sarah Reed, Joseph Benjamin, Susie Williams and Tony Granger, Appellees.

No. 12–06–00147–CV.

Court of Appeals of Texas, Tyler.

Sept. 26, 2007.

Rehearing Overruled Nov. 19, 2007.

Michael G. Carroll, Tyler, for appellant.

Joe Lee Register, Lufkin, for appellees.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

SAM GRIFFITH, Justice.

Appellant Karen Granger appeals the trial court's judgment denying her claim to one-half of a life insurance policy purchased by her deceased husband. In three issues, Karen argues that the beneficiaries of her husband's life insurance policy failed to prove by clear and convincing evidence that the policy was his separate property and that, if the policy was community property, the gift of the proceeds was a fraud on the community estate, entitling her to an appropriate remedy.

### BACKGROUND

Karen and Danny Granger were married on May 24, 1999 and had two children during the marriage. In 2003, Danny purchased two life insurance policies, one from Monumental Life Insurance Company in the amount of $150,000.00 and the other from Old Line Life Insurance Company of America in the amount of $100,000.00. Danny named his mother, Helen Granger, and his brother, Elijah Granger, as beneficiaries of the Monumental policy. He named his mother, four brothers, and two sisters as beneficiaries of the Old Line policy. Danny paid the premiums for both policies through automatic drafts from his Regions Bank account. The first Monumental policy premium was drafted on March 4, 2003 in the amount of $15.00 and the first Old Line policy premium was drafted in May of 2003. Danny died on October 27, 2003. After his death, Monumental distributed the proceeds of its policy to Helen Granger and Elijah Granger.

On March 22, 2004, Old Line filed suit, seeking to deposit funds in the court's registry to resolve conflicting claims to the proceeds of its insurance policy. Karen, Helen, and Danny's four brothers and two sisters were named defendants. Karen filed a cross action against Danny's mother, four brothers, and two sisters, claiming that Danny's gifts of her one-half community interest in the policies constituted fraud on her and on the community estate. The trial court ordered that Old Line's policy proceeds be deposited into the registry of the court. After a bench trial, the trial court found that Danny had community funds in his possession when he purchased the Old Line policy and that one-half of the policy was Karen's community property. However, the trial court found that Danny used separate property funds to purchase the Monumental policy and, thus, the policy was Danny's separate property. The trial court ordered that Karen recover one-half of the proceeds of the Old Line policy, but that she take nothing on her claims regarding the Monumental policy. The trial court also ordered that Danny's mother, four brothers, and two sisters recover the other one-half of the proceeds of the Old Line policy.

In its findings of fact and conclusions of law, the trial court stated as follows:

1. Danny and Karen were married on May 24, 1999, and ceased to live together as husband and wife approximately one year before his death as a result of an auto accident on or about October 27, 2003, in Lufkin, Angelina County, Texas.

2. Danny was totally disabled as determined by the Social Security Administration as of June 22, 2000, and was awarded Supplemental Security Income ("SSI") which was paid monthly to him with payments being made to Sarah Reed for Danny beginning July 1, 2000.

3. Danny received $457.00 in SSI payments for each month during the

year of 2003, through the month of his death in October 2003. The SSI payments paid to Danny because of his total disability was received by his sister, Sarah Reed, and thereafter paid over to Danny in cash payments.

4. Danny purchased a life insurance policy through Regions Bank accidental death insurance plan with an effective date of March 1, 2003, issued by Monumental providing for $150,000.00 for accidental death benefits.

5. Danny paid the monthly premiums to Monumental by a bank draft through Regions Bank in the amount of $15.00 per month with the first premium being paid on March 4, 2003.

6. Danny possessed no monies other than monies received by him through his SSI payments and gifts from family members at the time of the purchase of the life insurance policy on his life through Monumental.

7. Those funds on deposit on March 4, 2003, in Danny's account with Regions Bank was the separate property of Danny.

8. Danny had no community property monies at the time of the purchase of the life insurance policy on his life with Monumental.

9. Danny designated his mother, Helen Granger, and his brother, Elijah Granger, as beneficiaries in equal shares of the life insurance proceeds to be paid under the policy issued by Monumental.

10. After Danny had purchased life insurance from Monumental on his life, he received a check from Willie Spikes, Jr., in the amount of $315.00 dated March 12, 2003, which was presumed to be community property of Danny and Karen.

11. Danny purchased a life insurance policy issued on his life by Old Line effective May 3, 2003, after Danny had in his possession those funds paid to him by Willie Spikes, Jr. in the amount of $315.00.

12. The cross-defendants proved that the life insurance policy issued by Monumental on the life of Danny was the separate property of Danny by rebutting the presumption that the same was community property by clear and convincing evidence.

13. At the time of inception of title by Danny of the Monumental policy[,] the policy was characterized as separate property because it was acquired by the use of separate property funds.

14. Cross-defendants failed to rebut the presumption that the life insurance policy purchased by Danny from Old Line during his marriage to Karen was not the community property of Danny and Karen.

This appeal followed.

### SEPARATE PROPERTY

In her first issue, Karen argues that the beneficiaries of her husband's Monumental life insurance policy failed to prove by clear and convincing evidence that the policy was his separate property.

### Standard of Review

We review a trial court's division of property under an abuse of discretion standard. *Moroch v. Collins,* 174 S.W.3d 849, 857 (Tex.App.-Dallas 2005, pet. denied); *see also Garza v. Garza,* 217 S.W.3d 538, 548 (Tex.App.-San Antonio 2006, no pet.). A trial court does not abuse its discretion if there is some evidence of a

substantive and probative character to support the decision. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857. A trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence under the same legal standards applied to review jury verdicts for legal and factual sufficiency of the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996); *M.D. Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991).

■ However, in family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review and, as a result, legal and factual sufficiency are not independent grounds of reversible error. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857. Instead, they constitute factors relevant to our assessment of whether the trial court abused its discretion. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857. Thus, in considering whether the trial court abused its discretion because the evidence is legally or factually insufficient, we apply a two prong test: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857. We then consider whether, based on the evidence, the trial court made a reasonable decision. *Garza*, 217 S.W.3d at 549; *Moroch*, 174 S.W.3d at 857.

We review the trial court's conclusions of law de novo. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 257 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The standard of review for conclusions of law is whether they are correct. *Id.* We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Id.* Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

### Applicable Law

■ Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. TEX. FAM.CODE ANN. § 3.003(a) (Vernon 2006). To overcome this presumption, a party must present clear and convincing evidence that the property is separate. *Id.*, § 3.003(b); *Garza*, 217 S.W.3d at 548. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM.CODE ANN. § 101.007 (Vernon 2002). In order to overcome the community property presumption, the burden is on the spouse claiming certain property as separate to trace and clearly identify the property claimed to be separate. *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex.App.-Fort Worth 2004, no pet.). A spouse's separate property consists of the property owned or claimed by the spouse before marriage, the property acquired by the spouse during marriage by gift, devise, or descent, and the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage. TEX. FAM.CODE ANN. § 3.001 (Vernon 2006).

■ Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Boyd*, 131 S.W.3d at 612. As a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community property presumption. *Garza*, 217 S.W.3d at 548; *Moroch*, 174 S.W.3d at 855. Any doubt as to the character of property should be resolved in favor of the commu-

nity estate. *Garza*, 217 S.W.3d at 548; *Moroch*, 174 S.W.3d at 856. The presumption that obtains when the marriage is dissolved applies to dissolution by death as well as divorce. *Smith v. Lanier*, 998 S.W.2d 324, 331 (Tex.App.-Austin 1999, pet. denied). Social security benefits are not subject to division under community property laws because the language in 42 U.S.C.A., section 407 of the Social Security Act manifests a congressional intent to preempt state law. *Richard v. Richard*, 659 S.W.2d 746, 747–49 (Tex.App.-Tyler 1983, no writ) (citing *In re Marriage of Kelley*, 64 Cal.App.3d 82, 98, 134 Cal.Rptr. 259, 268 (1976)). The provisions of section 407 of the Social Security Act apply to Supplemental Security Income benefits to the same extent pursuant to section 1383(d)(1) of the Social Security Act. *See* Social Security Act, 42 U.S.C.A. § 1383(d)(1) (West, Westlaw through Feb. 2006).

### Analysis

At trial, Karen testified that she and Danny were separated about one year before his death on October 27, 2003. When they married, Danny worked at the Atkinson Candy Kitchen and did carpentry work in the evenings and on weekends. About a year after they were married, Danny quit working at the Candy Kitchen and began receiving SSI, but continued to work as a carpenter. Karen agreed that Danny's SSI check went to his sister, Sarah Reed, on the first of every month. Karen stated that, most of the time, Danny paid his child support when he received the check. She denied that Danny relied upon his family for support or that he was living with his mother when he died. Other than the $315.00 check from Willie Spikes, Jr., Karen had no other documentation regarding any monies that Danny earned in the year after they separated. Karen admitted that Danny borrowed money from her at times after they separated. Although Karen stated that she saw people pay Danny money for carpentry work, she admitted that this occurred before their separation. She acknowledged that she did not have access to Danny's bank accounts.

Willie Spikes, Jr. testified that, in March of 2003, he hired Danny to remodel his residence. As payment for the work, Spikes wrote a check to Danny in the amount of $315.00 on March 12, 2003. Danny's bank records show that he deposited $200.00 of this check into his Bank of America account on March 13, 2003. This check was deposited after Regions Bank drafted the Monumental premium on March 4, 2003. Spikes also testified that while Danny worked for him, people would frequently approach Danny asking him to perform carpentry jobs for them. Two other witnesses testified that Danny performed carpentry work for them, but admitted that he did the work about two months before his death on October 27, 2003.

Sarah Reed, Danny's sister, testified that she helped him obtain SSI benefits because he suffered from schizophrenia. Sarah stated that Danny received a check each month for SSI benefits in the year before his death, but that she handled his funds. Sarah stated that when she received Danny's SSI check, she either deposited it into her account or cashed the check. Because she advanced Danny monies "all of the time," she would deduct the amount advanced from his SSI check and give him the rest of it. She denied that Danny was able to perform carpentry work in the year before he died. At that time, she stated that any work Danny might have done would have been minimal because he was very sick. Sarah had no knowledge of any work that Danny performed from November 2000 to the date of Spikes's check which would have gained

him any income. As far as she knew, Danny had no other funds from which to purchase life insurance besides his SSI check.

Sarah stated that Danny lived with their mother and did not pay rent. Nor did he have the money to help pay for his mother's utilities. She testified that her mother and all of their siblings gave Danny money because he was always "broke." To her knowledge, Danny spent most of the last year of his life at home and did not work for any extended period of time. She stated that Danny paid Karen child support after their separation and, to the best of her knowledge, it was paid from his SSI benefits.

Elijah Granger, Danny's brother, testified that he lived next door to his mother and Danny. He agreed that Danny suffered from schizophrenia and had long periods of depression. Other than the time Danny worked for Spikes, Elijah was not aware of any time that Danny had any kind of employment for Spikes or anyone else during the last months of his life. Because he lived next door to his mother and Danny, Elijah saw Danny daily. Elijah stated that most of the time Danny would be sitting in his "studio," playing his guitar. He was not aware that Danny performed any work for Spikes, although he stated that Danny did practice his guitar with Spikes, who was also a musician. The only money he knew Danny had during the last year of his life that would have allowed him to purchase life insurance was his SSI check. Almost every time Elijah saw Danny, he was "broke" and needed money. If Danny needed help, such as gas money or money to go to the store, he provided it. Suzie Anna Williams, Danny's sister, testified that Danny was always "broke." She was not aware that he worked regularly during the last year of his life. Other than his SSI check, Suzie

did not believe Danny had any funds to pay for insurance premiums.

Regarding Danny's Regions Bank account, the evidence showed that he had no deposits over $200.00 for the months from April of 2002 through November of 2002. During these months, his account was frequently overdrawn. When he deposited $500.00 in December of 2003, his account had a balance of $1.98. At the beginning of January, the account had a balance of $0.97. He deposited $20.00 on February 4, 2003, leaving a balance of $15.97. In February, Danny made two other deposits totaling $170.00. At the time the Monumental premium was drafted on March 4, 2003, the account had a balance of $52.04. At the same time, the balance in his bank account with Bank of America was $18.92. At the end of December 2002, his Bank of America account had a $20.42 balance, although he deposited $500.00 on December 4, 2002. Danny's Bank of America account was overdrawn for almost the entire month of January 2003, and he made only three deposits totaling $50.00 from January 2003 until March 12, 2003. The evidence also shows that Sarah gave Danny a check in the amount of $452.00 on January 30, 2003 and that Danny paid Karen $500.00 on February 28, 2003. None of Sarah's deposit slips from January through March 2003 match the amount of Danny's SSI check.

 Because the Monumental policy was purchased during the marriage, the policy is presumed to be community property. *See* TEX. FAM.CODE ANN. § 3.003(a). However, Danny's relatives with knowledge of his financial matters testified that he had no income from approximately October 2002 to March 4, 2003 other than his SSI benefits or their gifts to him, both of which were his separate property. *See* TEX. FAM.CODE ANN. § 3.001; *Richard*, 659 S.W.2d at 747–49. Further, they denied

that he worked as a carpenter regularly during the last year of his life and said he was usually "broke." Although Karen disputed their testimony, we note that, in a bench trial, the trial court, as fact finder, is the sole judge of the credibility of the witnesses. *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied). As fact finder, the court may take into consideration all of the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Id.* The trial court could have believed Elijah and Sarah, relatives who lived close to Danny during the last year of his life, and disbelieved Karen from whom he had been separated.

The only documented community property income Danny received was earned after he purchased the Monumental policy. His Regions Bank account had only a nominal balance at the beginning of January 2003 and the deposits in January and February of 2003 were never documented as being anything other than SSI benefits or gifts from his family. Although Sarah's account did not show that she deposited Danny's SSI check in February or March of 2003, she could have given him cash from those checks as reflected by her testimony. Further, Danny's Bank of America account was either overdrawn or showed little activity between January and March 4, 2003. Because Danny's relatives testified that he did not have any income other than SSI and gifts from family from approximately October 2002 to March 4, 2003 and his bank records did not document any such income, there was sufficient evidence to rebut the community property presumption and the trial court did not abuse its discretion in finding the Monumental policy to be Danny's separate property. *See Garza,* 217 S.W.3d at 548–49; *Moroch,* 174 S.W.3d at 855–57. Accord-

ingly, we overrule Karen's first issue. Because our holding on Karen's first issue is dispositive, we need not consider her remaining issues.

### DISPOSITION

The judgment of the trial court is *affirmed.*