# NO. 12-23-00171-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE MATTER OF THE MARRIAGE OF MARIA E. RENTERIA AND RODRIGO L. RENTERIA AND IN THE INTEREST OF N. M. R. & P. S. R., CHILDREN* | § § § | *APPEAL FROM THE 321ST* *JUDICIAL DISTRICT COURT* *SMITH COUNTY, TEXAS* |

## MEMORANDUM OPINION

Appellant, Rodrigo L. Renteria, appeals the trial court's final judgment of divorce. In four issues, he challenges the trial court's finding of an informal marriage between himself and Maria E. Renteria beginning in 1994, the subsequent division of the community estate, and the trial court's finding as to his net monthly resources. We affirm in part and reverse and remand in part.

## BACKGROUND

Rodrigo and Maria commenced a romantic relationship in 1990 or 1991, prior to Maria's sixteenth birthday on April 12, 1991.[1] Rodrigo and Maria ceremonially married each other on April 4, 2011. They share three children, only one of whom was a minor at the time of the final judgment of divorce.

On June 20, 2019, Maria filed a petition for divorce, in which she alleged that she and Rodrigo were married "on or about January 1, 1991," and "ceased to live together as spouses on or about June 20, 2019." Thereafter, Rodrigo filed a counterpetition alleging that the parties were only married as of April 4, 2011, the date of their ceremonial marriage.

---

[1] Because the parties share a surname, we will refer to them by their respective first names for the sake of clarity.

The trial court held a bifurcated bench trial on the merits. The first stage of trial, which commenced on November 3, 2020, determined whether Rodrigo and Maria were informally married before their ceremonial marriage (and if so, when such informal marriage occurred). The trial court initially ruled via e-mail that the parties were informally married as of January 1, 1997. The second stage of the bifurcated trial, which commenced on April 5, 2022, addressed all remaining issues; of particular relevance to this appeal is the division of the community estate. Both Maria and Rodrigo presented expert witness testimony on the value of Rodrigo's cement mixing business, Tyler Mix LLC.

The trial court signed the Final Decree of Divorce on May 10, 2023, which contained orders pertaining to the division of community property and custody and support of the parties' remaining minor child. The court awarded Tyler Mix to Rodrigo and assigned the business a net value of $281,616.00. Additionally, "to equalize the estate," the court awarded a judgment to Maria in the amount of $150,000.00, secured by "an owelty lien and deed of trust on the property at 12167 CR 1114, Tyler, Texas, awarded herein to Rodrigo Renteria." However, the judgment does not actually award the specified property to either party.

The decree further calculated Rodrigo's monthly net resources at $8,500.00 and orders him to pay child support of $1,700.00 monthly for the parties' minor child. The trial court's findings of fact and conclusions of law noted that it considered the following factors in calculating Rodrigo's net resources: "a. Rodrigo Renteria's actual reported income; b. cash payments received by Rodrigo Renteria that may or may not have been reported; c. benefits provided to Rodrigo Renteria by his company, such as automobile payments[,] cell phone, lease, and other payments which benefitted Rodrigo Renteria; d. salary payments for others (non-owners) by Rodrigo Renteria's business which exceeded his salary." Similarly, the final decree of divorce stated:

> The Court found that Tyler Mix, LLC, owned by Rodrigo L. Renteria … provided the following financial benefits to Rodrigo L. Renteria that constitutes imputed income: The LLC purchase [sic] the vehicles operated by Rodrigo L. Renteria. The LLC purchased automobile insurance on his personal vehicles and paid for operating expenses for his vehicles. Rodrigo L. Renteria's cell phone account was paid for by the LLC. Nayana Renteria's vehicles costs were paid by the LLC along with the automobile insurance and operation expenses… the LLC paid Rodrigo L. Renteria's rent and utilities. Maria Renteria's utilities were paid by the LLC. The benefits provided by the LLC in the form of payment for personal expenses, rent and transportation,

constitutes imputed income and that combined with his salary justified setting child support above guidelines. Cash was discovered in the residence from the operations of the LLC ($115,000+), indicating that often times he did not report all of his income.

On June 7, the trial court issued findings of fact and conclusions of law pursuant to Rodrigo's request for same; said findings specified that Rodrigo and Maria were informally married as of January 1, 1991. Rodrigo subsequently requested additional or amended findings of fact and conclusions of law to clarify the different informal marriage dates given in the trial court's e-mail ruling and findings, respectively. On September 28, the trial court issued supplemental findings of fact and conclusions of law, which stated that Rodrigo and Maria were informally married as of December 19, 1994. This appeal followed.

## STANDARD OF REVIEW

In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review; as a result, legal and factual sufficiency are not independent grounds of reversible error, but instead constitute factors relevant to our assessment of whether the trial court abused its discretion. *See Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). To determine whether the trial court abused its discretion we consider whether the trial court (i) had sufficient evidence on which to exercise its discretion and (ii) erred in its exercise of that discretion. *See In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). The applicable sufficiency review comes into play with the first question. *See Moroch*, 174 S.W.3d at 857. We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *See id.* An abuse of discretion generally does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *See In re S.M.V.*, 287 S.W.3d 435, 450 (Tex. App.—Dallas 2009, no pet.). Findings of fact made after a bench trial have the same force and dignity as a jury's verdict upon questions and are reviewed for legal and factual sufficiency of the evidence by the same standards. *In re C.H.C.*, 392 S.W.3d 347, 349–50 (Tex. App.—Dallas 2013, no pet.). Because the trial court has "full opportunity to observe witness testimony first-hand," it is "the sole arbiter when assessing the credibility and demeanor of witnesses." *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Legal sufficiency questions the existence of any evidence to support a particular finding, and essentially claims the evidence at trial can point to only one legal outcome—that is, the opposite of the outcome made by the fact finder. *See, e.g.*, **Ford Motor Co. v. Ridgway**, 135 S.W.3d 598, 601 (Tex. 2004). In conducting a legal sufficiency review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* We review the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822.

In contrast, when conducting a factual sufficiency review, we consider all the pertinent record evidence, both supporting and conflicting. **Hambrick v. Foremost Cnty. Mut. Ins.**, 688 S.W.3d 369, 375 (Tex. App.—Tyler 2024, no pet.) (citing **City of Keller**, 168 S.W.3d at 826). When conducting a factual-sufficiency review, we do not substitute our judgment for that of the factfinder. **Golden Eagle Archery, Inc. v. Jackson**, 116 S.W.3d 757, 761 (Tex. 2003). We will set aside the judgment only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. **City of Keller**, 168 S.W.3d at 826.


<u>**INFORMAL MARRIAGE**</u>

Rodrigo contends that the trial court erred in finding that he and Maria were informally married in 1994, prior to their ceremonial marriage in 2011.[2]

**Applicable Law**

In Texas, an informal marriage can be proved by evidence establishing three elements: (1) the couple agreed to be married; (2) after the agreement, they lived together in Texas as spouses; and (3) they represented to others that they were married.[3] TEX. FAM. CODE ANN. §

---

[2] As part of his argument pertaining to this first issue, Rodrigo contends that the trial court made conflicting findings as to the date of the parties' informal marriage. "[W]hen a trial court issues findings that conflict with an initial finding, the later findings control over the earlier findings." **In re C.T.H.S.**, 311 S.W.3d 204, 206 (Tex. App.—Beaumont 2010, pet. denied); *see also* **Nw. Dodge, Inc. v. Woody**, No. 01-02-00669-CV, 2003 WL 1848689, at *1 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, pet. denied) (mem. op.) ("Although the trial court's additional findings and conclusions are in conflict with the original findings and conclusions, the conflict must be resolved in favor of the later findings."). Therefore, for appellate purposes, the trial court's factual finding that Rodrigo and Maria were informally married as of December 19, 1994, controls over its earlier pronouncements.

[3] The statutory requirement of representation to others is synonymous with the judicial requirement of "holding out to the public." **Lee v. Lee**, 981 S.W.2d 903, 906 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

2.401(a)(2) (West 2023); *Nguyen v. Nguyen*, 355 S.W.3d 82, 88–89 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The party seeking to establish the marriage's existence bears the burden of proving the three elements by a preponderance of the evidence. *Nguyen*, 355 S.W.3d at 88 (citing *Weaver v. State*, 855 S.W.2d 116, 120 (Tex. App.—Houston [14th Dist.] 1993, no pet.)). "Until the three elements co-exist, there is no ... marriage." *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (citing *Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ)).

<u>Agreement to be Married</u>

A party may prove the existence of an agreement to be married by direct or circumstantial evidence. *In re O.R.M.*, 559 S.W.3d 738, 744 (Tex. App.—El Paso 2018, no pet.). "To establish that the parties agreed to be married, it must be shown that they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that may be ended by either party." *Id.* Further, the agreement must have been to be "presently" married, not to marry sometime in the future. *Rodriguez v. State*, No. 08-16-00118-CR, 2018 WL 3372637, at *15 (Tex. App.—El Paso July 11, 2018, pet. ref'd) (mem. op.).

The testimony of one party that both individuals agreed to be married may constitute some direct evidence that such an agreement occurred. *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Martinez v. Furmanite Am. Inc.*, No. 04-17-00318-CV, 2018 WL 4469973, at *5 (Tex. App.—San Antonio Sept. 19, 2018, pet. denied) (mem. op.) (alleged wife's affidavit statement that she and alleged husband agreed to be married raised fact issue on existence of agreement). Proof of cohabitation and representations to others that the couple are married may constitute circumstantial evidence of an agreement to be married, depending on the facts of the case. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). Because in modern society it is difficult to infer an agreement to be married from cohabitation, evidence of "holding out" must be particularly strong to be probative of such an agreement. *See Assoun v. Gustafson*, 493 S.W.3d 156, 160 (Tex. App.—Dallas 2016, pet. denied.).

If an impediment to the creation of a lawful marriage exists, such as when one party is married to someone else, there can be no common law marriage, even if all elements are proven. *Martinez*, 2018 WL 4469973, at *4 (citing *Ballesteros v. Jones*, 985 S.W.2d 485, 489-90 (Tex. App.—San Antonio 1998, pet. denied)). However, an ongoing agreement to be married may be

shown by the circumstantial evidence of the parties continuing to live together as husband and wife and holding themselves out to others as being married after the removal of the impediment. *Id.*

*Cohabitation*

The requirement that parties to an informal marriage live together in Texas as spouses is commonly referred to as cohabitation. Cohabitation is "more than sexual relations under a common roof[;]" it indicates maintaining a household together and doing things ordinarily done by spouses. *Claveria v. Estate of Claveria*, 597 S.W.2d 434, 437 (Tex. App.—Dallas 1980), *rev'd on other grounds*, 615 S.W.2d 164 (Tex. 1981). However, there is no bright-line rule for how long a couple must cohabit in order to satisfy this requirement, and it is not necessary for the spouses' cohabitation to be continuous. *Small v. McMaster,* 352 S.W.3d 280, 285 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *Winfield*, 821 S.W.2d at 645.

*Representation of Marriage to Others*

The statutory requirement of representation to others may be established by the conduct and actions of the parties, rather than spoken words. *Lee v. Lee*, 981 S.W.2d 903, 906 (Tex. App.—Houston [1st Dist.] 1998, no pet.); *Mills v. Mest*, 94 S.W.3d 72, 75 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). However, the parties' "isolated references" to each other as husband and wife are not sufficient to establish representation. *Winfield*, 821 S.W.2d at 651. Whether the couple had a reputation in the community as being married is a significant factor in determining the representation element. *Small*, 352 S.W.3d at 285; *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.) (evidence demonstrating purported spouses "consistently conducted themselves as husband and wife in the public eye" would support finding of informal marriage). Moreover, *both* parties must represent to the public that they are spouses; evidence of representations by only one purported spouse is not sufficient. *Mills*, 94 S.W.3d at 75; *Lee*, 981 S.W.2d at 907.

**The Evidence**

Maria testified at trial that she first met Rodrigo when she was "around 15" years old, while he was dropping off his sister at the same middle school Maria attended. The two began a romantic relationship shortly thereafter. Following Maria's sixteenth birthday in April of 1991, Rodrigo asked her to move in with him. Maria averred that Rodrigo "…just said for me to go live with him as his wife, that he wanted me to stay with him," and that she did in fact leave her

6

mother's house to move in with Rodrigo at his mother's house in Tyler, Texas. After a few months, the couple moved into a home they rented from Rodrigo's brother, Aurelio, and stayed there for about one year before moving to Florida together, where Maria attended high school for about four months (withdrawing in January 1993). After they returned from Florida, Maria and Rodrigo briefly lived together in Chapel Hill, Texas. They next moved to a home located on East Travis Street in Tyler, where they lived together continuously until their separation in 2019. Although there were times she and Rodrigo were arguing and did not sleep in the same bedroom, Maria was consistent in her testimony that from 1991 until the time she filed for divorce, they never lived apart from each other.

The record includes, as a trial exhibit, several excerpts from the joint income tax returns Maria and Rodrigo filed for the years 2000, 2001, 2004, 2005, 2006, 2007, and 2009.[4] These documents list the taxpayer's name as Rodrigo Renteria Lopez and the spouse's name as Maria E. Lino (Maria's maiden name). The record also contains a deed executed on January 22, 2002, by which Aurelio conveyed the property on East Travis Street to "Rodrigo Renteria and wife, Maria Renteria." A deed of trust and affiliated promissory note for the property, acknowledged by both Rodrigo and Maria before a notary the same day, similarly both identify the grantors as "Rodrigo Renteria and wife, Maria Renteria." On December 19, 2003, Rodrigo and Maria executed a deed of trust to Bank of America granting a lien on another property in Tyler. This document identifies the grantors as "Rodrigo Lopez Renteria and Maria E. Renteria, married to each other."

Maria became a United States citizen in August of 2006, prior to the parties' ceremonial marriage. She testified that when she completed paperwork throughout the process, she listed her marital status as single. Maria explained that she did this because her driver's license (which used her maiden name, Lino) was her only form of identification, and she did not have any documents proving that she was married to Rodrigo.

The trial exhibits also include registration paperwork for Tyler Junior College completed by Maria in 1995 and 1997. On the forms, under "Permanent (Parent's Address)," Maria listed her mother's address rather than the address where she alleges she lived with Rodrigo. Maria testified that she did this because the school would send documents to the address she provided,

---

[4] Carla Hernandez, Maria's sister-in-law and a tax preparer, stated that she could not access any tax returns prior to the year 2000. The returns in evidence are unsigned digital copies; however, Carla testified that Rodrigo signed all the returns prior to filing.

and Rodrigo would have forbidden her from attending. Moreover, we note that the registration documents contain questions about claiming in-district residency for tuition purposes, to which Maria responded that she was claiming residency based upon a parent's address. Also in evidence are excerpts of hospital records from 1997 and 2004 related to the respective births of the couple's first and second children. In these records, Maria's marital status is shown as "single," and her listed address differs from the address she alleges she shared with Rodrigo. Maria testified that she gave the hospital a different address and stated she was single at Rodrigo's direction, "so he didn't have to pay the bill." She explained that she "did what [Rodrigo] told me, or otherwise he would be very, very violent."

Miguel Renteria, the parties' adult son, stated that he co-owns a business, "Tyler Mix," with Rodrigo. He testified that he lived with his parents in the home on East Travis Street for most of his life. He stated that sometimes Rodrigo left "for a couple weeks at a time," and slept in an RV on the property "for years." However, to Miguel's knowledge, Maria never lived anywhere else other than the East Travis Street address during the previous twenty years.

Carla Hernandez, Maria's sister-in-law,[5] testified that she opened her own income tax preparation business, Maya Professional Services, in 1997. She knew Rodrigo before meeting Maria and began preparing Rodrigo's income tax returns shortly after opening her business. Maya Professional Services only retains client documents for five years, as required by the IRS. However, to Carla's recollection, in the more than twenty years she prepared his taxes (prior to the initiation of the divorce proceeding), Rodrigo always filed a joint tax return together with Maria. Rodrigo referred to Maria as "mi mujer" in conversation, which Carla understood was commonly used by Spanish speakers to mean "my wife," and which she understood as Rodrigo identifying Maria as his wife. She visited the house on East Travis Street approximately twice a year during her acquaintance with the parties and had no knowledge of Maria ever moving elsewhere during that time. Rodrigo primarily provided all the financial information and documents that Maya Professional Services used to complete the tax returns; Carla did not recall Maria having any significant involvement in the process. Carla testified that Rodrigo signed all the returns prior to filing, and that filing a return that the taxpayer did not sign would put her at risk of losing her business. When she provided Rodrigo the prepared returns to review before

---

[5] Carla Hernandez met Eduardo Hernandez, Maria's brother, in 2006, and the two married in 2009. Until 2009, Carla had no legal relationship to Maria.

filing, he never objected to the representation therein that he and Maria were married to each other. Similarly, Maria never told Carla that she was not married to Rodrigo.

Eduardo Hernandez, Maria's younger brother, stated that he met Carla in 2006, went to work for her at Maya Professional Services in 2007, and married her in 2009. When Rodrigo came to the office looking for him, he asked for his "cunado," the Spanish term for brother-in-law. Eduardo further testified that Maria lived at home with him and their mother until she moved out to live with Rodrigo and never returned home to live with them after that. To his knowledge, from the time she moved out to the time the parties separated, Maria and Rodrigo always lived together.

Rigoberto Lino, also Maria's younger brother, testified that he met Rodrigo in 1991, shortly after he and Maria began their relationship. Maria moved out of their mother's home in 1991 to live with Rodrigo, and never returned. Generally, when they were around others, Rodrigo referred to Maria as his wife, and Maria referred to Rodrigo as her husband. Neither Rodrigo nor Maria ever told him that they were not married to one another.

Maria's mother, Maria Barroso, testified that her daughter moved out to live with Rodrigo when she was approximately 15 years old. At the time when she moved out, Maria told Barroso that she was married to Rodrigo. Maria never returned to live at Barroso's house, and Barroso never visited Maria and Rodrigo at their home because Rodrigo refused to allow it.

Amber Leech, a friend of Maria's, testified that she visited the house on East Travis Street on multiple occasions over the ten years she had known Maria, met Rodrigo there approximately nine times, and observed that Rodrigo's possessions were present in the home and that Maria and Rodrigo generally appeared to be living together. The first time she met Rodrigo, Maria introduced him as her husband.

Eugene Caldwell, a former teacher of Maria's, stated that when Maria graduated from Tyler Junior College, he attended a party at the home on East Travis Street. On this occasion, he met Rodrigo, who he called "[Maria's] husband." He stated that he knew of Rodrigo as Maria's husband "all throughout knowing" her, although he never spoke to Maria about her marital status. Caldwell averred that he visited their home twice more after the party, related to his duties as a truancy officer, and found that Maria and Rodrigo were still living there together.

Regina Riddle, a former real estate agent, testified that she handled a closing related to the sale of a property co-owned by Maria and Rodrigo. In connection with obtaining a title

insurance policy for the sale, Rodrigo completed an affidavit of marital status in which he averred that he was single when he acquired a certain property in 2007, and subsequently married "Maria E. Lino" on "4/__/2010." This affidavit contains a page entitled "Spouse's Corroboration," which Maria acknowledged before Riddle as notary, averring that the statements in Rodrigo's affidavit were true and correct. Riddle had limited independent recollection of the transaction and did not recall which spouse gave her the marriage date on the affidavit. She further did not recall anyone informing her that the parties were married earlier than the date on the affidavit.

In his own testimony, Rodrigo did not expressly deny asking Maria to live together as husband and wife as she described. However, he averred generally that the parties "never got married." Rodrigo testified that he met Maria and commenced a relationship with her "at the end of 1992[;]" Maria did not move out of her mother's house to live with him but would "come and go from the house." He further claimed that Maria never moved to Florida with him; instead, she "visited" him in Florida for periods of two to six months at a time. Rodrigo's trial testimony is somewhat unclear as to the periods of time during which he claims he and Maria were not cohabiting. He appears to state at various times that that they lived apart from 1995 to 2000, in 2004, and from 2008 to 2009, but lived together "like around 2002,"and in 2007. He further testified that between 2000 and 2009, the longest time he and Maria cohabited was "two to three years," and that he "never knew where [Maria] lived" when they were not cohabiting.

Rodrigo stated that Carla began preparing his tax returns in 1997, that he provided the information necessary to complete the returns, and that Maria was not involved in doing so. However, he claimed that he had no opportunity to review the 2000 tax return before it was filed. Rodrigo stated both that he did not recall ever signing a tax return and that he signed "some" returns from 2000 through the present. He then testified that he did see the tax returns from the years 2000 to 2010 and saw Maria's name on the first page, but "never paid attention to it." Rodrigo claimed he only found out in 2019 that the returns represented that he and Maria were married, and "ha[d] no explanation" as to why the tax returns listed Maria as his wife.

**Analysis**

Rodrigo challenges the legal and factual sufficiency of the evidence to support the trial court's finding that he and Maria had an agreement to be married, and the factual sufficiency of

the evidence to support the trial court's findings on the elements of cohabitation and representation to others.

Maria's direct testimony that Rodrigo requested she live with him "as his wife" is more than a scintilla of evidence of an agreement to be married.[6] *See Eris*, 39 S.W.3d at 714. Viewing the evidence in the light most favorable to the trial court's finding, we conclude the evidence is such that reasonable minds could differ in their conclusions about whether Maria and Rodrigo agreed to be married.[7] Thus, the evidence is legally sufficient to support the trial court's finding that the parties agreed to be married.

Turning to factual sufficiency, although the totality of the evidence is conflicting, it largely turns on the witnesses' credibility and demeanor, and therefore was within the fact finder's purview to resolve. *See Golden Eagle Archery*, 116 S.W.3d at 761. We cannot say the evidence of an agreement to be married between Maria and Rodrigo is so weak as to render the trial court's finding clearly wrong and manifestly unjust. In particular, the evidence of cohabitation and representation of marriage to others, as more thoroughly discussed below, is circumstantial evidence supporting the existence of an agreement to be married between the parties.

While there was some conflicting evidence on the issue of cohabitation, the trial court heard the witnesses testify and had the opportunity to judge their credibility and resolve the conflicting evidence. Maria, Eduardo, and Lino all testified that Maria and Rodrigo continuously lived together as spouses since Maria initially left her mother's house to move in with Rodrigo. Similarly, Carla testified that Rodrigo and Maria lived together at the East Travis Street address from at least 1997 until they separated. Finally, Miguel testified that while he lived with his parents, he did not remember his father leaving the East Travis Street address to live elsewhere for more than a few weeks at a time. The trial court was free to reconcile the conflicting

---

[6] Rodrigo asserts that there was an impediment to the marriage at the time of this agreement because of Maria's age. However, there is evidence that the parties continued to live together and hold themselves out as married after she reached the age of majority in April of 1993. *See Martinez v. Furmanite Am. Inc.*, No. 04-17-00318-CV, 2018 WL 4469973, at *5 (Tex. App.—San Antonio Sept. 19, 2018, pet. denied) (mem. op.) (following removal of impediment to marriage, ongoing agreement to be married may be shown by the circumstantial evidence of the parties continuing to cohabit and representing themselves as being married).

[7] The Texas Supreme Court wisely opined in 1993, "In the future one of two basic fact patterns will develop depending on whether both parties [to an alleged informal marriage] are living. If both parties … are alive, one of them will commonly deny the agreement. When the other party to the alleged informal union offers direct evidence of an express agreement to be presently married, the trier of fact will be required to weigh the testimony in the context of other evidence of the relationship." *Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993).

evidence by giving less weight to Rodrigo's opposing testimony that he and Maria did not live together until 2002 and never cohabited for more than a few years at a time, or disbelieve Rodrigo's testimony entirely. And, even if the trial court accepted Rodrigo's assertion that he and Maria lived apart for some periods of time between 1991 and 2019, neither continuous cohabitation nor any definite length of cohabitation is required to satisfy this element of informal marriage. *See Small,* 352 S.W.3d at 285. Based on our review of all the evidence, we cannot conclude that the evidence of cohabitation is so weak as to render the trial court's finding on cohabitation clearly wrong and manifestly unjust.

Additionally, multiple witnesses testified at trial that Maria and Rodrigo represented themselves, and conducted themselves, as husband and wife. Carla stated that Rodrigo regularly referred to Maria as "mi mujer" during their conversations, which she understood to mean "my wife." *See Martinez*, 2018 WL 4469973, at *6 (husband's references to wife as "mujer" was evidence of holding out). Lino averred that the parties consistently referred to one another as "wife" and "husband," respectively. Further, Eduardo stated that Rodrigo frequently referred to him as his brother-in-law, indicating that Rodrigo was married to Eduardo's sibling. Barroso testified that when Maria moved out of her home to live with Rodrigo at about age 15, she told her mother that she was now married to Rodrigo. Leech testified that the first time she met Rodrigo, more than ten years before trial, Maria introduced him as her husband, and she always understood that Maria and Rodrigo were married. Similarly, Caldwell testified as a member of the community acquainted with the parties that Maria and Rodrigo conducted themselves as husband and wife. *See Deneve*, 285 S.W.3d at 910.

Rodrigo does not dispute that he and Maria filed joint tax returns, indicating that they were a married couple, from the time Maya Professional Services began preparing their returns in 1997 through the time of their separation. He further admitted that he knew Maria's name was listed on the documents and would have signed at least "some" of the returns. Although representations made to governmental entities regarding marital status do not estop a party from later claiming in an unrelated suit the existence or non-existence of an informal marriage, trial courts may properly consider such representations as evidence either supporting or refuting a claim of informal marriage. *Leyendecker v. Uribe*, No. 04-17-00163-CV, 2018 WL 442724, at *5 (Tex. App.—San Antonio Jan. 17, 2018, pet. denied) (mem. op.) (citing *Small*, 352 S.W.3d at 286). Moreover, the house and property on East Travis Street were deeded to both Rodrigo and

Maria, who was expressly named as his wife; both parties similarly granted a deed of trust for the property using documentation that specified Maria as Rodrigo's wife. There was comparatively less evidence that the parties did *not* represent themselves as a married couple prior to their ceremonial marriage, including (1) Maria's testimony that she described herself as single during the process of gaining United States citizenship, (2) the hospital records wherein Maria listed herself as single, and (3) the affidavit of marital status and spousal corroboration (accompanied by Riddle's testimony that she did not remember which party provided the 2010 marriage date listed).

We may not substitute our judgment for that of the trier of fact, nor may we reweigh the evidence and set aside the trial court's findings unless they are clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery*, 116 S.W.3d at 761. After reviewing all the evidence, we cannot say the evidence of representing to others is so weak that the trial court's finding is clearly wrong and manifestly unjust. *See Lewis v. Anderson*, 173 S.W.3d 556, 564 (Tex. App.—Dallas 2005, pet. denied); *see also Romano v. Newell Recycling of San Antonio, LP*, No. 04-07-00084-CV, 2008 WL 227974, at *6 (Tex. App.—San Antonio Jan. 30, 2008, no pet.) (mem. op.) (conflicts in testimony and documentary evidence "do not preclude a finding that a common law marriage existed ... rather the conflicts go to the weight of the evidence and were for the trial court to resolve."). Thus, the evidence is factually sufficient to support the trial court's finding that the parties represented to others that they were married.

In summary, we conclude that the evidence in this matter is legally and factually sufficient to support the trial court's verdict as to the three elements of an informal marriage, and that the trial court did not abuse its discretion in finding that Maria and Rodrigo were informally married. Consequently, we overrule Rodrigo's first issue.

## DIVISION OF MARITAL ESTATE

In his second and third issues, Rodrigo argues that when dividing the marital estate, the trial court abused its discretion in valuing Tyler Mix, LLC and imposing an owelty lien on property owned by Tyler Mix. For the sake of clarity, we first address Rodrigo's third issue.

**Standard of Review and Applicable Law**

The Family Code requires that the trial court divide the marital estate in a manner that is just and right having due regard for the rights of each party. TEX. FAM. CODE ANN. §§ 7.001, 7.003 (West 2023). We should only reverse a trial court's division of property if the error materially affects the court's just and right division of the estate. *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 640 (Tex. App.—Tyler 2008, no pet.). A trial court's division of a marital estate is reviewed for abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). A trial court abuses its discretion when it acts arbitrarily and unreasonably, or without reference to guiding rules and legal principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011 no pet.). As previously stated, in determining whether the trial court abused its discretion by deciding an issue without sufficient evidentiary support, "we engage in a two-pronged inquiry: (1) [d]id the trial court have sufficient evidence upon which to exercise its discretion and (2) [d]id the trial court err in its application of that discretion?" *Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.— Fort Worth 2004, no pet.). We then consider whether, based on the evidence, the trial court made a reasonable decision. *Granger v. Granger*, 236 S.W.3d 852, 856 (Tex. App.—Tyler 2007, pet. denied).

Valuation errors, standing alone, do not constitute an abuse of discretion. *Matter of Marriage of Hardin*, 572 S.W.3d 310, 313–14 (Tex. App.—Amarillo 2019, no pet.). However, "a trial court abuses its discretion in dividing the community estate without knowledge of its extent and proof of its value." *Id.* (quoting *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 549 (Tex. 2018) (Devine, J., concurring)).

An owelty is the difference in value that results when a court divides real property into shares of unequal value in partition proceedings. *Gonzales v. Pounds*, No. 07-21-00088-CV, 2022 WL 348403, at *2 (Tex. App.—Amarillo Feb. 4, 2022, no pet.) (mem. op.) (citing *McNally v. McNally*, No. 02-18-00142-CV, 2020 WL 5241189 at *7 (Tex. App.—Fort Worth Sept. 3, 2020, pet. denied) (mem. op.)). The court may then order an owelty payment to equalize the shares' value and impose a lien on the greater share in favor of the recipient of the lesser share to secure the owelty payment. *Id.* "Application of the doctrine of owelty is limited to those cases in which partition in kind is adjudged." *Rodriguez v. Rivas*, 573 S.W.3d 447, 453 (Tex. App.— Amarillo 2019, no pet.).

**Imposition of Owelty Lien**

Rodrigo contends in his third issue that the trial court improperly imposed an owelty lien and deed of trust on the property located at 12167 CR 1114. Specifically, he argues that the property in question was neither community nor separate property but was instead the property of Tyler Mix. As Tyler Mix was a nonparty to the case, Rodrigo asserts that the trial court lacked personal jurisdiction over it, and therefore could not encumber the entity's property.

The final decree of divorce in this matter awards three pieces of real property to Maria, and one to Rodrigo. The decree imposes a $150,000.00 equalization payment from Rodrigo to Maria because the trial court awarded the entirety of Tyler Mix to Rodrigo, to be secured by "an owelty lien and deed of trust on the property at 12167 CR 1114, Tyler, Texas, awarded herein to Rodrigo Renteria." On separate pages of the judgment, the trial court orders (in a seemingly contradictory fashion) that the lien be signed both by "Tyler Mix, LLC and Rodrigo Renteria, individually," and by Rodrigo "both individually and as Member/Manager of Tyler Mix, LLC." However, outside of references to the owelty lien, the property at 12167 CR 1114 is only explicitly mentioned in the judgment as Rodrigo's address of employment and is not actually awarded to either party in the division of marital assets. Similarly, the trial court's findings of fact and conclusions of law state that "a fair just and equitable division of the estate is set out on Exhibit 'A' attached hereto," and further that the equalization payment from Rodrigo to Maria "should be secured by an owelty lien on the property awarded to Rodrigo Renteria located at 12167 CR 1114, Tyler, Texas." However, the spreadsheet comprising Exhibit A contains no reference to the aforementioned property.

Rodrigo claims on appeal that "[12167 CR 1114] is not owned by Husband or Wife; it is owned by Tyler Mix," but cites no portion of the record which evidences the ownership of the property. He further appears to argue that the trial court must have intentionally failed to identify the property as part of either the community estate or the separate estate of either spouse because it is neither. Maria admits that the record contains no "information as to whether Tyler Mix LLC or Rodrigo individual [sic] was the owner of record of 12167 CR 1114, Tyler, Texas," but claims that (1) Rodrigo failed to preserve error on this claim and (2) Rodrigo inconsistently both argues nonjoinder on behalf of Tyler Mix and claims that the trial court could not issue an order to Tyler Mix as it is not a party to this action.

After reviewing the record, we are unable to locate any evidence pertaining to the ownership or valuation of 12167 CR 1114, Tyler, Texas, nor does the record evidence an award of this property to either party. We therefore cannot determine whether the trial court's imposition of an owelty lien on this property was permissible. Moreover, in the absence of *any* characterization of this property (as part of the marital estate or otherwise), or evidence of its proper valuation, we cannot conclude that the trial court's division of community property as a whole was "just and right" or evaluate the materiality of the error. *See* TEX. FAM. CODE ANN. § 7.001. We conclude that the evidence is insufficient to support the trial court's exercise of its discretion to impose the owelty lien at issue as part of the division of community property herein. Specifically, the record shows that the trial court lacked sufficient knowledge of the extent of the marital estate or its value, particularly pertaining to the property located at 12167 CR 1114, when rendering its division of the community property. *See* **Hardin**, 572 S.W.3d at 313. We sustain Rodrigo's third issue.

When error is committed in the division of property upon divorce (regardless of whether the error lies in the division of the property itself, or in defining what property is properly a part of the community estate), a court of appeals is not permitted to either render a different division or to remand only specific properties for a new division; rather it must remand the entire community estate for a new division. **Jacobs v. Jacobs**, 687 S.W.2d 731, 733 (Tex. 1985); **In re Marriage of Morris**, 123 S.W.3d 864, 868 (Tex. App.—Texarkana 2003, no pet.). Therefore, we do not reach Rodrigo's second issue, as it also pertains to the division of the marital estate herein. *See* TEX. R. APP. P. 47.1.


## CALCULATION OF NET RESOURCES

In his fourth issue, Rodrigo contends that the evidence was legally and factually insufficient to support the trial court's finding, for purposes of setting the amount of child support, that his monthly net resources amounted to $8,500.00.

**Standard of Review and Applicable Law**

A trial court's support order will not be disturbed on appeal unless the complaining party shows that the order constituted a clear abuse of the court's discretion. **Worford v. Stamper**, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); **Burney v. Burney**, 225 S.W.3d 208, 213 (Tex. App.—El Paso 2006, no pet.). "In the child-support context, sufficiency challenges are not

independent points of error, but are incorporated into an abuse of discretion determination." ***Marquez v. Moncada***, 388 S.W.3d 736, 739 (Tex. App.—Houston [1st Dist.] 2012, no pet.). As aforementioned, review in this context is two-pronged: an appellate court determines whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in applying its discretion because it made an unreasonable decision. ***Stamper v. Knox***, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.); ***Zeifman v. Michels***, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied).

The Texas Family Code establishes guidelines for calculating monthly child support obligations in suits affecting the parent-child relationship. *See* ***Grotewold v. Meyer***, 457 S.W.3d 531, 534 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The foundation underlying such a calculation is the parent's monthly net resources. ***Markey v. Markey***, 634 S.W.3d 293, 295 (Tex. App.—Amarillo 2021, no pet.) (citing ***Tenery v. Tenery***, 932 S.W.2d 29, 30 (Tex. 1996)). Resources include several types of income, including "all other income actually being received." TEX. FAM. CODE ANN. § 154.062(a), (b) (West 2023); *see also* ***In re P.C.S.***, 320 S.W.3d 525, 537 (Tex. App.—Dallas 2010, pet. denied) (language of Texas Family Code Section 154.062(b) indicates legislature intended "all receipts of money that are not specifically excluded by the statute ... whether nonrecurring or periodic, whether derived from the obligor[ ] [parent's] capital or labor or from that of others, must be included in the definition of 'resources'").

While a self-employed obligor may deduct certain personal expenses as business expenses on his taxes, the trial court may take that into consideration in determining the obligor's actual income is greater than the adjusted gross income listed on his tax returns. *See* ***Freeze v. Ramirez***, No. 04-18-00213-CV, 2019 WL 2014988, at *2 (Tex. App.—San Antonio May 8, 2019, no pet.) (mem. op.) (citing ***In re M.A.B.***, No. 11-05-00034-CV, 2006 WL 893613, at *2 (Tex. App.—Eastland Apr. 6, 2006, no pet.) (mem. op.)).

**Trial Court Findings and Evidence**

The record contains a copy of Rodrigo's 2020 tax return as well as the parties' joint 2018 income tax return. Also in evidence are a 2020 tax statement for Tyler Mix, a profit and loss statement for January to June 2019, and several forms W-2 and 1099-MISC from the year 2019, from Tyler Mix to multiple individuals. In the 2020 tax return, Rodrigo states his total wages as $52,000.00, while in the 2018 return, he gives his total income as $43,770.00. The combined total of the 2019 W-2 and 1099-MISC to Rodrigo is $27,800.00. Rodrigo stated at trial that his

weekly salary from Tyler Mix is $1,000.00 before tax, but Miguel's weekly salary from Tyler Mix is double his own, $2,000.00 before tax, because "he got a knowledge what he's doing. He drives the loader. That's the reason." The profit and loss statement claims that Tyler Mix, which began operating on March 20, 2019, made a net income of $177,878.26 through June of that year.

Rodrigo admitted that he pays a significant portion of his monthly expenses directly from a BancorpSouth bank account belonging to Tyler Mix, including about $600.00 for Maria's utilities for the East Travis Street residence, $320.00 for homeowners' insurance for the East Travis Street residence, about $1,500.00 for rent on his own apartment, $110.00 for electricity for his apartment, $303.00 for the parties' adult daughter Nayana's personal vehicle, $330.00 for car insurance for his, Maria's, and Nayana's respective vehicles, "[b]etween $400.00 and $500.00" to Nayana for gasoline and various expenses, approximately $120.00 for fuel for his own personal vehicle, and $60.00 per month for his and Nayana's cell phones. He stated that he makes the monthly loan payment for his personal vehicle from the Tyler Mix bank account but did not state the amount of this payment. Rodrigo agreed to pay Maria $650.00 per month in temporary child support during the pendency of the divorce and stated that he made this payment from the Tyler Mix account. Rodrigo further averred that he pays an average of $2,000.00 per month in credit card bills, although his testimony was unclear as to the exact basis for the expenditures or the source of the monthly payments.

Maria introduced as evidence bank statements for Rodrigo's personal account showing that on a January 2019 trip to Las Vegas, he spent over $1,200.00 for a hotel room, over $1,400.00 at Louis Vuitton (which he testified was for a backpack for himself), and $216.00 for show tickets. The bank statement also shows charges exceeding $2,400.00 at clothing and cosmetics stores including Diesel, Saks Fifth Avenue, Guess, Gap, Topshop, Victoria's Secret, Skins Cosmetics, and Sephora. Rodrigo testifies that some of the purchases were for Maria, while Maria testified that Rodrigo did not bring her anything from Las Vegas.

Rodrigo also testified concerning cash in excess of $115,000.00 that Maria located in the parties' personal safe at the East Travis Street residence at the time of the divorce filing. He stated that the money was business income from customers who paid Tyler Mix in cash, and that the amount accrued from March 20, 2019, to approximately June 20, 2019. Later in his testimony, Rodrigo claimed that this amount was not deposited into the business bank account

because "[i]t was savings for paying the taxes, and it was savings to go buy cash equipment and options."

**Analysis**

As factfinder, the trial court had the discretion to disbelieve Rodrigo's testimony as to his net resources and was not required to accept as true Rodrigo's testimony regarding his income. *See Pavon v. Hernandez*, No. 14-10-00059-CV, 2011 WL 1631790, at *3 (Tex. App.—Houston [14th Dist.] Apr. 28, 2011) (mem. op.). Because the trier of fact is in a better position to determine the candor, demeanor, and credibility of the witnesses, we will not substitute our judgment for that of the trial court. *Id.* The trial court could reasonably find significant the salary difference between Rodrigo and Miguel (where Rodrigo asserted that Miguel was co-owner of the business), particularly considering that the expenses Rodrigo admitted to paying from the Tyler Mix bank account alone exceeded his reported monthly gross salary. Similarly, the trial court was permitted to disbelieve Rodrigo's explanation for the presence of $115,000.00 in cash in his personal safe as being undeposited customer payments to Tyler Mix (rather than income he took in the form of cash to artificially deflate his reported salary). There existed evidence of a substantive and probative character that Rodrigo's reported salary was inaccurate, particularly in light of his admittance to paying personal expenses from the Tyler Mix bank account and not from his personal account. *See, e.g.*, *Clark v. Binder*, No. 03-22-00631-CV, 2024 WL 2868277, at *5 (Tex. App.—Austin June 7, 2024, no pet. h.) (mem. op.) (finding significant in resource calculation that father "appears to spend more money than the income his tax returns indicate he would have"); *Burney*, 225 S.W.3d at 214 (holding trial court properly determined that obligor had higher net resources than his tax returns indicated, based on obligor's inability to account for deposits in his banking account above his monthly salary).

Based on the record evidence, the trial court could reasonably conclude that Rodrigo's income actually received was significantly greater than the amount he claimed he received as wages or disclosed on his income tax returns. Federal income tax regulations are distinct from the rules in the Texas Family Code, and calculations prepared under one set of rules do not necessarily comply with the requirements of the other; trial courts are not bound by a party's federal tax returns when determining that party's net resources. *See Hudson v. Markum*, 948 S.W.2d 1, 4 (Tex. App.—Dallas 1997, writ denied). We conclude the trial court had sufficient information regarding Rodrigo's monthly resources on which to exercise its discretion and did

not err in exercising its discretion based on that information. Consequently, we overrule Rodrigo's fourth issue.

## DISPOSITION

Having sustained Rodrigo's third issue, we *reverse* the property division of the trial court in its entirety and *remand* this matter to the trial court for further proceedings consistent with this opinion. We *affirm* the remainder of the trial court's judgment. All pending motions are *overruled as moot*.

BRIAN HOYLE
Justice

Opinion delivered July 24, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 24, 2024**

**NO. 12-23-00171-CV**

**IN THE MATTER OF THE MARRIAGE OF MARIA E. RENTERIA AND RODRIGO L. RENTERIA AND IN THE INTEREST OF N. M. R. & P. S. R., CHILDREN**

Appeal from the 321st District Court
of Smith County, Texas (Tr.Ct.No. 19-1506-D)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED, and DECREED by this court that the property division of the trial court be **reversed** in its entirety and the cause **remanded** to the trial court **for further proceedings,** the judgment be **affirmed in all other respects,** and each party bear their own costs of this appeal in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*